IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellant*,

*v.*

IAN MITCHAM, *Appellee*.

No. 1 CA-CR 23-0014
FILED 8-22-2023

---

Appeal from the Superior Court in Maricopa County
No. CR2018-118086-001
The Honorable Roy C. Whitehead, Judge

**REVERSED AND REMANDED**

---

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Ryan Green & Nick Klingerman (argued)
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Michael O'Toole & Alice M. Jones
*Amicus Counsel for Arizona Attorney General's Office in Support of Appellant*

Maricopa County Public Defender's Office, Phoenix
By Jeffrey A. Kirchler, Martha Barco Penunuri (argued), Richard D.
Randall, Kevin Heade, & Mikel Steinfeld
*Counsel for Appellee*

Arizona Attorneys for Criminal Justice, Tucson
By David J. Euchner & Grant D. Wille
*Amicus Counsel for Arizona Attorneys for Criminal Justice in Support of
Appellee*

American Civil Liberties Union Foundation of Arizona, Phoenix
By Jared G. Keenan
*Amicus Counsel for ACLU of Arizona in Support of Appellee*

American Civil Liberties Union Foundation, New York
By Vera Eidelman (argued), *Pro Hac Vice*
*Amicus Counsel for American Civil Liberties Union in Support of Appellee*

———————————————

**OPINION**

Presiding Judge Paul J. McMurdie delivered the Court's opinion, in which
Judge Michael J. Brown joined. Judge Michael S. Catlett specially
concurred.

———————————————

**M c M U R D I E**, Judge:

**¶1**         The State appeals from the superior court's order suppressing
Mitcham's DNA profile. The State argues that developing a DNA profile
from blood lawfully in its possession does not constitute a search under the
Fourth Amendment. In the alternative, the State argues that, under the
circumstances, the use of Mitcham's DNA profile is permitted by an
exception to the warrant requirement.

**¶2**         We agree with the State that creating a DNA profile from a
lawfully held blood sample does not violate the Fourth Amendment. But
here, the State's possession was no longer lawful because the State acquired
the blood through consent and developing a DNA profile from it exceeded
the scope of that consent. Still, the superior court erred by suppressing
Mitcham's DNA profile because (1) probable cause supported his arrest
even without the impermissible DNA match that allowed the State to obtain
a buccal swab and develop a DNA profile; and (2) once Mitcham pled guilty
to other felony charges, the profile was properly in the State's possession.
Thus, we reverse the suppression order and remand for further
proceedings.

**FACTS AND PROCEDURAL BACKGROUND**

¶3        In February 2015, a woman was found dead in her home lying nude in a pool of blood. The victim had sustained several injuries, including a large wound on the back of her head, ligature marks around her neck, and several lacerations to her vagina. The police identified a strong chemical odor throughout the house, chemical burns on the victim, and blood smears near the furniture. Based on the evidence, the police concluded that the killer had tried to clean up the crime scene. The police collected biological swabs from the scene and developed an unknown male DNA profile. Police entered the unknown DNA profile into the federal Combined DNA Index System ("CODIS"). But the CODIS database returned no matches, and the murder went unsolved.

¶4        In 2018, law enforcement performed a familial DNA test on the unknown profile. The test identified an Arizona prison inmate as a close relative of the unknown profile. The police discovered the inmate had two brothers, one living close to the crime scene. As a result, the police began to surveil this brother, the defendant Ian Mitcham.

¶5        Coincidentally, the police were already familiar with Mitcham. In January 2015, they arrested Mitcham for a misdemeanor driving under the influence ("DUI") offense. Also, before the familial DNA test, Mitcham had been charged with a felony narcotics possession offense in 2016 and an aggravated DUI in 2017. *See State v. Mitcham*, Maricopa County Cause No. CR2016-111513-001; *State v. Mitcham*, Maricopa County Cause No. CR2017-001717-001. Mitcham would later plead guilty to both crimes.

¶6        During the 2015 DUI arrest, Mitcham consented to have his blood drawn. Police read Mitcham the warning provided by the Admin Per Se Implied Consent form, which provided that if Mitcham agreed to the draw, the blood would be used "to determine alcohol concentration or drug content." *See* Ariz. Dep't of Trans. Form #40-5807; *see also* A.R.S. § 28-1385. The warning authorized no other blood testing, and Mitcham was not informed that the police might conduct more tests. Based on the warning, Mitcham consented to a blood draw.

¶7        The police drew two blood vials according to Mitcham's 2015 consent. One vial allowed the police to test for alcohol or drug concentration, and the second allowed Mitcham to test his blood independently. Mitcham and the police officer signed a "Destruction Notice," which stated that if Mitcham did not pursue his opportunity to test

within 90 days, his blood "sample will have been destroyed and unavailable for reanalysis." The police tested their sample and determined Mitcham was over the legal limit, and he was later convicted of a misdemeanor DUI for this 2015 offense.

¶8 But the police did not destroy Mitcham's blood sample after 90 days passed and possessed it three years later when they identified that Mitcham might be the long-sought killer. The police—without obtaining a warrant—analyzed the blood from the 2015 DUI consent draw, creating Mitcham's DNA profile. Mitcham's profile matched the unknown DNA at the 2015 murder scene.

¶9 The police then sought a search warrant, requesting authorization to search Mitcham's home and place a GPS tracker on his car. The search warrant affidavit noted that (1) the police had obtained DNA from the crime scene left by an unknown male source, (2) a familial DNA test of that profile revealed that the unknown DNA likely belonged to a father, son, or brother of inmate Mark Mitcham, and (3) Ian Mitcham had been identified as Mark Mitcham's brother. The affidavit did not identify Mark Mitcham's other relatives or explain why Ian Mitcham had specifically been selected for investigation. But the addresses of the victim and Ian Mitcham were in the affidavit. The affidavit revealed that Ian Mitcham's blood sample was in the custody of the Scottsdale Police Department from his 2015 DUI arrest and that a DNA profile from the blood matched the unknown profile from the crime scene.

¶10 The court approved the search warrant. Mitcham was later arrested, and a buccal swab was taken as part of a routine booking procedure. *See* A.R.S. § 13-610(K), (O). The grand jury charged Mitcham with first-degree murder, second-degree burglary, and sexual assault.

¶11 Mitcham moved pretrial to suppress the DNA evidence from his 2015 DUI blood draw and the subsequent DNA buccal sample from his arrest. He argued that the "extraction and creation of a DNA profile from a consensual blood draw . . . was an unreasonable search under the Fourth Amendment" because it "went far beyond the scope of what was permitted by his prior consent in the unrelated DUI traffic stop." He added that the DNA profile from his arrest buccal swab was the fruit of the original illegal search.

¶12 The superior court held an evidentiary hearing and granted the suppression motion. The court reasoned that though the police "may have been able to secure a warrant for [Mitcham's] DNA through further

diligent investigation," the decision not to obtain a warrant "was at least a reckless violation of [Mitcham's] constitutional rights." The court also found it "troubling that the State essentially asserts that it has the unfettered ability to conduct subsequent searches of items held in custody for unrelated reasons." The court also suppressed Mitcham's DNA profile from the arrest buccal swab and any profile resulting from his convictions in the unrelated narcotics and aggravated DUI cases. Because the State intended to appeal, the superior court vacated the trial and stayed the proceedings.

¶13 The State appealed, and we have jurisdiction under Article 6, Section 9 of the Arizona Constitution and A.R.S. § 13-4032(6). *See State v. Limon*, 229 Ariz. 22, 24, ¶ 7 (App. 2011) ("[T]he plain language of § 13-4032 allows the state to appeal from an 'order granting a motion to suppress' without distinguishing between interlocutory or final orders.").

## DISCUSSION

¶14 The State challenges the superior court's application of the exclusionary rule to suppress the DNA evidence extracted from Mitcham's 2015 consensual blood draw. First, the State argues there was no Fourth Amendment violation because developing a DNA profile from lawfully obtained evidence is not a "second search." Second, the State argues that even if there were a Fourth Amendment violation, Mitcham's DNA profile should not have been suppressed because several exceptions applied.

¶15 We review a court's factual findings on a motion to suppress for an abuse of discretion, *State v. Smith*, 250 Ariz. 69, 80, ¶ 16 (2020), and consider "only the evidence presented at the suppression hearing . . . viewing it in the light most favorable to sustaining the trial court's ruling," *State v. Thompson*, 252 Ariz. 279, 290, ¶ 26 (2022). But we review *de novo* the legal question of whether a search complied with the Fourth Amendment. *Smith*, 250 Ariz. at 80, ¶ 16.

¶16 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *see also* Ariz. Const. art. 2, § 8 ("No person shall be disturbed in

his private affairs, or his home invaded, without authority of law.").[1] Traditionally, courts viewed search and seizure cases through a lens of "common-law trespass," considering whether the state "obtain[ed] information by physically intruding on a constitutionally protected area." *See United States v. Jones*, 565 U.S. 400, 405, 406, n.3 (2012). But this narrow approach has since been expanded. *See id.* at 405–06. Because "the Fourth Amendment protects people, not places," *Katz v. United States*, 389 U.S. 347, 351 (1967), it applies when an individual reasonably "seeks to preserve something as private," *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

¶17 Under the Fourth Amendment, the basic rule is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz*, 389 U.S. at 357); *accord State v. Valenzuela*, 239 Ariz. 299, 302, ¶ 10 (2016). But "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

¶18 It is well-settled that the drawing of blood by law enforcement, involving "intrusions into the human body," is a search under the Fourth Amendment. *See Schmerber v. California*, 384 U.S. 757, 767 (1966). But whether DNA identification analysis of a blood sample originally drawn for a non-identification purpose is a search has not yet been decided. *See Maryland v. King*, 569 U.S. 435, 464–65 (2013). In determining this issue, we are guided by two cases, *King* and *Mario W. v. Kaipio*, 230 Ariz. 122 (2012).

---

[1] In the superior court, the parties did not address whether the creation of Mitcham's DNA profile violated his state constitutional rights as distinct from his rights under the federal Fourth Amendment. On appeal, Mitcham asserts that the right to privacy under the Arizona Constitution "is broader than its federal counterpart against searches and seizures," providing an independent state ground to uphold the suppression. We do not consider this contour, as the Arizona Supreme Court has declined "to expand the Private Affairs Clause's protections beyond the Fourth Amendment's reach, except in cases involving warrantless home entries." *State v. Mixton*, 250 Ariz. 282, 290, ¶ 32 (2021).

**A.      Under *Mario W.*, the Creation of a DNA Profile from State-Held Evidence Is a Search, but It Does Not Require a Warrant If There Is Probable Cause or Reasonable Suspicion.**

¶19          Our supreme court in *Mario W.* addressed whether juveniles facing delinquency charges could be compelled to submit to DNA extraction and profiling before those charges were adjudicated as a statutory condition of release. 230 Ariz. at 125, ¶ 12; *see* A.R.S. § 8-238(A). The court noted that the process involved "two separate intrusions on [the juveniles'] privacy," distinguishing between the seizing of the buccal cells and the processing of the seized cells to create a DNA profile. *Id.* at 126–27, ¶ 18. Applying a "two-tiered approach," *id.* at 127, ¶ 20, the court first held that the seizure of the cells was a justifiable measure to ensure that the juveniles did not abscond, *id.* at 128, ¶ 24. "A judicial order to provide a buccal cell sample occasions no constitutionally distinguishable intrusion" from an order to provide fingerprints. *Id.* at ¶ 25. But the court rejected the statute's authorization to create profiles because DNA reveals "uniquely identifying information" and there was "no strong governmental interest in creating DNA profiles." *Id.* at 127, 129, ¶¶ 20, 28.

¶20          The State asserts that *Maryland v. King* "necessarily modified" *Mario W.* It argues that *Mario W.* "cannot be reconciled with *King*'s express holding that 'the processing of respondent's DNA sample's 13 CODIS loci did not intrude on respondent's privacy in a way that would make his DNA identification unconstitutional.'" *King*, 569 U.S. at 464. The State reads *King* too broadly.

¶21          In *King*, the United States Supreme Court considered the constitutionality of a Maryland statutory requirement that arrestees charged with "serious crimes" have buccal swabs taken and a CODIS profile created. *King*, 569 U.S. at 443–45. The Court held that taking and analyzing buccal swabs was a search but that the search was a reasonable "routine booking procedure." *Id.* at 465–66. The Court first noted that arrestees had diminished expectations of privacy. *Id.* at 462. The Court then evaluated the degree of the intrusion, deciding that it was minimal. *Id.* at 463–64. The Court reasoned that "CODIS loci come from noncoding parts of the DNA that do not reveal the genetic traits of the arrestee." *Id.* at 464. But the Court acknowledged that "science can always progress further," which "may have Fourth Amendment consequences." *Id.* The Court upheld the Maryland statute by balancing the reduced privacy interest against the minimal privacy invasion—given the "statutory protections that guard against further invasion of privacy." *Id.* at 465–66.

**¶22**         *King* overruled *Mario W.* to a degree.[2] But *King* did not hold that taking a buccal swab was not a search. The *King* Court only decided that taking and processing a swab for DNA identification was reasonable upon arrest for a serious crime. 569 U.S. at 465–66. Because *King* did not address whether DNA profiling—divorced from the physical process of its collection upon arrest—is a search, we are still bound by *Mario W.*'s conclusion that it is.[3] *See Mario W.*, 230 Ariz. at 129, ¶ 32. So we begin our analysis with *Mario W.*

**¶23**         In *Mario W.*, our supreme court did not hold that DNA analysis always requires a warrant. Instead, *Mario W.* held that the State could not extract a DNA profile from buccal swabs "absent either probable cause or reasonable suspicion." 230 Ariz. at 129, ¶ 31. And *Mario W.* further suggested that the absconding of a charged juvenile would provide sufficient justification to create a DNA profile. *Id.* at ¶ 30. Thus, *Mario W.* and *King* harmonize in concluding that whether DNA profiling violates the

---

[2]         We must follow Arizona Supreme Court decisions absent conflicting United States Supreme Court decisions on the same subject. *See State v. Crowley*, 202 Ariz. 80, 90, ¶ 30 (App. 2002); *Hernandez-Gomez v. Volkswagen of Am., Inc.*, 201 Ariz. 141, 143–44, ¶ 8 (App. 2001). As much as *King* and *Mario W.* addressed the same subject, we are bound to follow *King*.

[3]         *Mario W.*'s holding does conflict with other jurisdictions that have addressed this question after *King*. *See, e.g., Commonwealth v. Arzola*, 26 N.E.3d 185, 191 (Mass. 2015) ("[T]he DNA analysis of the unknown sample taken from the defendant's lawfully seized shirt revealed nothing more than the identity of the source, which is what an analysis of latent fingerprints would have revealed (albeit with less accuracy) had they been found on the clothing. Therefore, the DNA analysis was no more a search than an analysis of latent fingerprints would be."); *Raynor v. State*, 99 A.3d 753, 767–68 (Md. 2014) ("[W]e hold that DNA testing of the 13 identifying junk loci within genetic material, not obtained by means of a physical intrusion into the person's body, is no more a search for purposes of the Fourth Amendment, than is the testing of fingerprints, or the observation of any other identifying feature revealed to the public—visage, apparent age, body type, skin color. That Petitioner's DNA could have disclosed more intimate information is of no moment in the present case because there is no allegation that the police tested his DNA sample for that purpose."); *accord People v. Mendez*, 155 N.Y.S.3d 534, 536–37 (Sup. Ct. 2021); *Hedvall v. State*, 283 So.3d 901, 920 (Fla. Dist. Ct. App. 2019).

Fourth Amendment turns on the reasonableness of the process. Against this backdrop, we consider the arguments before us.

¶24 First, we reject the broad position urged by *amici* supporting the defense — that analyzing genetic material and generating a DNA profile "constitutes a search and seizure" and always requires a warrant. Such a restrictive view would "impose[] substantial burdens on law enforcement without vindicating any significant values of privacy." *See Robbins v. California*, 453 U.S. 420, 429 (1981) (Powell, J., concurring). Moreover, a holding that "[t]he government must therefore obtain a warrant to search or seize DNA" cannot be harmonized with *King*, which permitted warrantless, suspicionless DNA profiling of arrestees charged with "serious crimes," or *Mario W.*, which permitted it under some circumstances for juveniles taken into custody facing delinquency charges.

¶25 Of course, we agree that courts must take caution when it comes to DNA, as a "vast amount of sensitive information . . . can be mined," *United States v. Amerson*, 483 F.3d 73, 85 (2d Cir. 2007), that "reveal[s] a host of private medical facts," *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 617 (1989). And it may be true that the DNA analyzed for CODIS[4] contains medical information that will become accessible as technology advances. *See King*, 569 U.S. at 464 (Though noncoding parts of the DNA are used, "science can always progress further, and those progressions may have Fourth Amendment consequences."). But as *King* explained, the identification profile generated from the DNA does not reveal any medical data. *See id.* at 445. The identification number comprising the profile is no more intrusive than a nametag on a suitcase or a license plate number on a car.

¶26 Furthermore, unlike a blood-alcohol report, cell phone records, or a contraband package, this "string of numbers" alone is not evidence of a crime. *See King*, 569 U.S. at 445, 451 ("Like a fingerprint, the 13 CODIS loci are not themselves evidence of any particular crime, in the way that a drug test can by itself be evidence of illegal narcotics use. A DNA

---

[4] "The CODIS database is based on 13 loci at which the STR [short tandem repeat] alleles are noted and compared. . . . The CODIS loci are from the non-protein coding junk regions of DNA" and are "only useful for human identity testing." *King*, 569 U.S. at 445. "STR information is recorded only as a 'string of numbers'; and the DNA identification is accompanied only by information denoting the laboratory and the analyst responsible for the submission." *Id.*

profile is useful to the police because it gives them a form of identification to search the records already in their valid possession. In this respect the use of DNA for identification is no different than matching an arrestee's face to a wanted poster of a previously unidentified suspect; or matching tattoos to known gang symbols to reveal a criminal affiliation; or matching the arrestee's fingerprints to those recovered from a crime scene."). Decades ago, the United States Supreme Court approved using an identity-based rule-out test if there is particularized suspicion and the test is minimally intrusive. *See Hayes v. Florida*, 470 U.S. 811, 817 (1985) ("[T]he Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch.").

¶27        Given the limited information currently available from a CODIS DNA profile, creating a DNA profile from evidence in the State's possession does not always require a search warrant.

**B.        Searches Beyond the Scope of Authorization Are Unreasonable Under the Fourth Amendment.**

¶28        The first step in applying *King* and *Mario W.* is determining how the genetic material came into the State's possession. In *King* and *Mario W.*, the State obtained the genetic material under statutory authority on arrest. *See King*, 569 U.S. at 441; *Mario W.*, 230 Ariz. at 124, ¶ 2.[5] Unlike *King* and *Mario W.*, the State possessed Mitcham's blood sample via consent from the 2015 DUI arrest.

¶29        Mitcham argues that the subsequent DNA analysis in 2018 exceeded the scope of that consent. The State counters that the Fourth Amendment is no longer implicated once a biological sample has been lawfully and physically extracted from a suspect. The State minimizes the

---

[5]        "The Attorney General may, as prescribed by the Attorney General in regulation, collect DNA samples from individuals who are arrested." 34 U.S.C. § 40702(a)(1)(A). And the Attorney General may provide grants to state and local governments that analyze DNA profiles under local authority for inclusion in CODIS. 34 U.S.C. § 40701(a)(1). As of the date of the decision in *King*, it was noted: "Twenty-eight States and the Federal Government have adopted laws . . . authorizing the collection of DNA from some or all arrestees." 569 U.S. at 445.

consent issue, emphasizing that consent's scope "no longer matter[s]" once the blood is in the State's lawful possession.

¶30 As much as the State asserts that lawful possession is always sufficient to justify warrantless DNA analysis, the law provides otherwise. *See United States v. Davis*, 690 F.3d 226, 246 (4th Cir. 2012) (Supreme Court precedent did "not give a law enforcement agency carte blanche [authority] to perform DNA extraction and analysis derived from clothing lawfully obtained from the victim of a crime in relation to the investigation of other crimes."). The Supreme Court has long clarified that even lawful possession of a suspect's property does not allow the State to do whatever it wants with that property. *See, e.g.*, *Walter v. United States*, 447 U.S. 649, 654 (1980) ("The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents."); *United States v. Chadwick*, 433 U.S. 1, 15–16 (1977) (A steamer trunk was lawfully seized but a warrant was needed to open and determine its contents.), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991); *Riley v. California*, 573 U.S. 373, 401 (2014) (The seizure of a cell phone does not permit warrantless access to information within the phone.). This is because a person's interest in keeping information private does not vanish once the vessel of that information is held in police custody. A biological sample containing extractable DNA is no different.

## C. DNA Testing that Exceeds the Scope of Consent or Warrant Renders the State's Possession Unlawful.

¶31 The State argues that the way it obtains evidence, so long as it is done lawfully, is irrelevant. We disagree. *See Terry v. Ohio*, 392 U.S. 1, 29 (1968) ("[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation."). In other contexts, a suspect may grant limited consent to a police search but retain an expectation of privacy in areas beyond the scope of that consent. *See, e.g.*, *State v. Swanson*, 172 Ariz. 579, 584 (App. 1992) ("[C]onsent to 'take a look in the vehicle' does not encompass the further intrusion of 'tearing a car apart' by removing the door panels."); *State v. Paredes*, 167 Ariz. 609, 612 (App. 1991) ("The scope of a consensual search is limited to the scope of the consent given."); *State v. Florez*, 195 Ariz. 199, 205, ¶ 26 (App. 1999) (same). And the same rule applies to searches authorized by warrant or exigency. *See Walter*, 447 U.S. at 656 ("When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization."); *see also Arizona v. Hicks*, 480 U.S. 321, 325 (1987) ("[A]ction, unrelated to the objectives of the authorized

intrusion . . . produce[d] a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry.").

¶32        A hypothetical helps clarify this point. A homeowner's consent to police to enter a home to seize a briefcase would not authorize the police to begin collecting hair or skin cells from the homeowner's carpet. This is true even though (1) the collection of cells left in public is generally permissible, and (2) the officers had permission to enter the home. Under the consent, the officers would only be authorized to do what they requested permission to do—seize the briefcase.[6]

¶33        Consent to a blood draw for testing for intoxicants does not authorize the police to create a DNA profile from the cells in that blood to investigate unrelated offenses. It does not matter that (1) blood cells found in public can be DNA tested or (2) the police had lawfully obtained the blood for chemical analysis. Under the consent provided, the police could search for drugs or alcohol. But the later creation of a DNA profile is as much an unconsented privacy violation as the unrequested collection of DNA samples from within a home.

¶34        Still, the State claims, without explanation, that it is "hard to analogize blood or one's DNA profile to a portion of a home, package, vehicle, clothing, cell phone, computer or other private piece of property to which one usually may want the ability to 'limit' the 'scope' of their consent." Given the medical information in one's blood, we have no such difficulty. *See Mario W.*, 230 Ariz. at 127, ¶ 20 (DNA analysis "is, in effect, the analog to opening the steamer trunk in *Chadwick* and the purse in *Tiffany O.* to see what is inside."). *See generally In re Tiffany O.*, 217 Ariz. 370 (App. 2007).

¶35        Mitcham consented to a blood draw during the 2015 DUI arrest. Thus, the relevant question is whether the later creation of the DNA profile for use independent of the DUI fell within Mitcham's consent. *See State v. Becerra*, 239 Ariz. 90, 92, ¶ 8 (App. 2016). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness." *Jimeno*, 500 U.S. at 251. And "[w]hether a consensual search remained within the bounds of the actual consent is a

---

[6]        Of course, the police may also seize evidence of a crime in plain view if the police are lawfully within the home. *See generally Coolidge v. New Hampshire*, 403 U.S. 443, 465–66 (1971). For simplicity, we omit discussion of this exception because it is not relevant here.

question of fact to be determined from the totality of circumstances." *Swanson*, 172 Ariz. at 583.

¶36 Under the Admin Per Se Implied Consent agreement, Mitcham consented to the taking and analyzing of his blood "to determine alcohol concentration or drug content." The written consent admonition did not authorize the creation of a DNA profile to investigate unrelated offenses or for unrelated crime detection. The consent form allowed the police to determine only what percentage of the sample comprised alcohol or intoxicating drugs. Given these facts, the superior court did not abuse its discretion by finding that creating a DNA profile from Mitcham's 2015 blood draw exceeded the scope of his consent to draw the blood. And action outside the scope of consent renders the State's evidence unlawful, no matter how minimally intrusive. *See Hicks*, 480 U.S. at 325 ("A search is a search, even if it happens to disclose nothing but the bottom of a turntable.").

**D. Despite the Fourth Amendment Violation, the Superior Court Erred by Suppressing Mitcham's DNA Profile.**

¶37 "[T]o say that the Fourth Amendment applies here is the beginning point, not the end of the analysis." *King*, 569 U.S. at 446; *see also Nix v. Williams*, 467 U.S. 431, 444 (1984). "The Fourth Amendment protects the right to be free from 'unreasonable searches and seizures,' but it is silent about how this right is to be enforced." *Davis v. United States*, 564 U.S. 229, 230–31 (2011).

¶38 "The exclusionary rule, which allows suppression of evidence obtained in violation of the Fourth Amendment, is a prudential doctrine invoked to deter future violations." *Valenzuela*, 239 Ariz. at 308–09, ¶ 31. Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search. *Stone v. Powell*, 428 U.S. 465, 486 (1976). "The rule's sole purpose . . . is to deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236–37. Thus, the rule is appropriate only when deterrence is necessary, and the "substantial social costs" are accounted for. *Id.* at 237. Given the "enormous societal cost of excluding truth," suppression of evidence should not place the police in a worse position than they would have been without the illegal conduct. *See Nix*, 467 U.S. at 443–45; *Sutton v. United States*, 267 F.2d 271, 272 (4th Cir. 1959) ("It is one thing to say that officers shall gain no advantage from violating the individual's rights; it is quite another to declare that such a violation shall put him beyond the law's reach even if his guilt can be proved by evidence that has been obtained lawfully.").

**1.    The State Had Probable Cause to Arrest Mitcham Even Without the DNA Profile Showing a Match.**

¶39    Creating a DNA profile from Mitcham's 2015 DUI blood sample was an unauthorized search. But the superior court also suppressed subsequent DNA collection and analysis as the fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Brown v. Illinois*, 422 U.S. 590, 599–600 (1975). We reverse the suppression order because the police had probable cause to arrest Mitcham even without the DNA match from the 2015 blood draw.

¶40    It is unclear from the record whether Mitcham was arrested under an arrest warrant or the police's statutory arrest authority. *See* A.R.S. § 13-3883(A)(1). Though the superior court ordered the suppression of "subsequent DNA swabs collected pursuant to the warrant," there is no such warrant in the record before us. The affidavit submitted for a *search* warrant (for a search of Mitcham's home and GPS tracking of his car) noted the DNA profile derived from Mitcham's 2015 DUI blood sample, but that warrant was not the basis for collecting buccal swabs here.

¶41    In any event, A.R.S. § 13-610(K) directs that when a person arrested for a serious offense is transferred to jail, the arresting authority "shall secure a sufficient sample of buccal cells or other bodily substances for deoxyribonucleic acid testing and extraction from the person for the purpose of determining identification characteristics." Because the procurement of a buccal swab from Mitcham would have been required upon his arrest for first-degree murder, the relevant question is whether the police had probable cause to arrest Mitcham without the improperly-obtained DNA match from the 2015 blood draw. *See* A.R.S. § 13-3883(A)(1); *cf. State v. Sardo*, 112 Ariz. 509, 515 (1975) (quoting *United States v. Kandlis*, 432 F.2d 132, 135 (9th Cir. 1970)) ("This is a case where 'the arrest and search are inextricably intertwined. The officers could neither arrest nor search without probable cause; if they had probable cause, they could do both.'").

¶42    "To determine whether an officer had probable cause for an arrest," we determine whether the "facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). We consider *de novo* the mixed question of whether the facts presented established probable cause. *State v. Buccini*, 167 Ariz. 550, 555 (1991).

**¶43**         Without resorting to the DNA profile from Mitcham's 2015 DUI blood sample and even without resorting to evidence developed from the warrant-based search of Mitcham's home and GPS tracking, the police had probable cause for the arrest. The familial DNA result, obtained independently, established that the unknown DNA at the crime scene matched inmate Mark Mitcham's first-degree relative, meaning a father, son, or brother. At the suppression hearing, the police testified that Mark's father was dead, Mark's two sons lived out of state, and Mark had two brothers in the Phoenix area, one of whom was Ian Mitcham. The police also noted that the addresses of Ian Mitcham and the victim were close and that Ian Mitcham's 2015 DUI arrest occurred in Scottsdale.

**¶44**         Probable cause for an arrest is present when the arresting officer knows "facts and circumstances . . . sufficient to warrant a man of reasonable caution to believe that a felony had been committed by the person arrested." *Sardo*, 112 Ariz. at 515 (quoting *State v. Edwards*, 111 Ariz. 357, 360 (1974)). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," *Illinois v. Gates*, 462 U.S. 213, 243, n.13 (1983), and "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014).

**¶45**         While the evidence is no doubt weaker without the information about the DNA match from the 2015 blood draw, the familial match and Mitcham's proximity to the crime scene would provide a "man of reasonable caution" to believe that Mitcham may have committed the murder. *See Sardo*, 112 Ariz. at 515. And Mitcham has never challenged the validity of his arrest independently from his challenge to the results of the 2015 DNA profiling. In fact, at oral argument before this court, Mitcham conceded that the police had probable cause to support his arrest even without the DNA match evidence.

**¶46**         Thus, while the DNA profile from the 2015 blood sample was impermissibly obtained, the evidence independent of that DNA profile provided sufficient probable cause to authorize Mitcham's arrest. And once Mitcham was arrested for first-degree murder, the police were required to take a buccal swab and extract a DNA profile independent of the prior violation. *See* A.R.S. § 13-610(K). For these reasons, we conclude that the superior court's order suppressing Mitcham's DNA profile as a fruit of the illegal search was error.

### 2. The DNA Evidence Would Have Inevitably Been Obtained from Mitcham's Other Felony Convictions.

¶47        Another independent basis exists for reversing the court's suppression order. Mitcham's DNA is already in CODIS because of his felony convictions in 2022. Mitcham's later convictions for unrelated crimes provide an independent source for the State to possess Mitcham's DNA profile, proving that his profile would have inevitably been discovered even had the police not created a profile in 2018. As a result, the State argues that the inevitable discovery doctrine should apply to prevent suppression of Mitcham's DNA profile.

¶48        In reply, Mitcham seeks to distinguish the "independent source" and "inevitable discovery" doctrines, claiming that failing to fully elaborate on both arguments below results in a waiver on appeal. We disagree. We see no value in requiring the State to develop both "closely related" doctrines fully, *see Nix*, 467 U.S. at 443, especially when, as here, the arguments amount to the same thing: Mitcham's 2022 felony convictions are an independent and inevitable cause of the creation of his CODIS profile.

¶49        Mitcham also counters that he only "pled guilty as a strategic choice" to his two felonies because of the pending murder charge against him. He implies that his convictions for aggravated DUI and narcotics offenses are fruits of the purported illegal search, so the court cannot consider them in an inevitable discovery analysis.

¶50        This argument is meritless. Mitcham does not allege that his pleas were involuntary or not supported by a factual basis, merely that it was a "strategic choice" for him to enter those guilty pleas. In any event, a "plea is itself a conviction and like a jury verdict is conclusive." *State v. Linsner*, 105 Ariz. 488, 491 (1970). Under the law, Mitcham is guilty of those offenses, and the State must submit his DNA to the federal CODIS database under A.R.S. § 13-610.

¶51        Because the police would have acquired Mitcham's DNA profile even without the search of the 2015 blood draw, the superior court erred by suppressing Mitcham's DNA profile.

### CONCLUSION

¶52        We reverse the order suppressing Mitcham's DNA profile and remand for further proceedings consistent with this opinion.

**CATLETT,** Judge**,** concurring in the judgment:

¶53        I concur in the judgment reversing the suppression order. Unlike the majority, however, I would not reach the inevitable discovery issue. Mitcham did not have a reasonable expectation of privacy in the non-coding regions of DNA the State lawfully possessed in 2018. Thus, no search and no Fourth Amendment violation occurred.

**I.**

¶54        The majority correctly explains the background in *Mario W. v. Kaipio*, 230 Ariz. 122 (2012), and *Maryland v. King*, 569 U.S. 435 (2013). *Mario W.* held that extracting and profiling a juvenile's DNA for pre-trial processing involved two distinct searches—one upon extraction, one upon profiling. 230 Ariz. at 126—27 ¶ 18. The court then analyzed whether the two searches were reasonable in the absence of a warrant. The court concluded the first search—extracting a juvenile's DNA—was reasonable even without a warrant. *Id.* at 128 ¶ 25. The court concluded the second search—obtaining the DNA profile from the sample—was unreasonable when a juvenile has not absconded. *Id.* at 129 ¶ 32.

¶55        The State argues *King* renders *Mario W.* "untenable." The majority is correct that, although *King* overrules a portion of *Mario W.*'s reasonableness analysis, it does not overrule *Mario W.*'s holding that profiling a juvenile's DNA under the statute at issue was a search separate and apart from DNA extraction. Maj. Op. ¶ 22.

¶56        Yet the majority's subsequent analysis and application of *Mario W.* is perplexing. The majority concludes that *Mario W.* "did not hold that DNA analysis always requires a warrant" and similarly rejects that "analyzing genetic material and generating a DNA profile 'constitutes a search and seizure' and always requires a warrant." Maj. Op. ¶¶ 23, 24. Both that conclusion and rejection are sound. But the majority fails to explain the import of those observations. Does DNA analysis always constitute a search? Or does DNA analysis only sometimes constitute a search? If DNA analysis is only sometimes a search, when is it a search and when is it not? Why was the DNA analysis here a search? The majority does not clarify.

¶57        The majority, for example, acknowledges a split among state courts regarding whether a search occurs when the government creates a DNA profile using lawfully possessed blood. *See* Maj. Op. ¶ 22 n.3. The

majority then appears to take sides with those courts requiring a warrant or a warrant exception (thereby extending *Mario W.* to criminal investigations). *See* Maj. Op. ¶¶ 29-36. The majority analyzes the reasonableness of the police conduct at issue here (which would be unnecessary unless a search occurred), and then concludes that profiling Mitcham's DNA was unreasonable because the State exceeded the scope of Mitcham's consent. But, in so doing, the majority largely skips the crucial question in this case: whether the State conducted a new search in 2018.

¶58 The majority also extends statements in *Mario W.* too far in favor of the State, arguably creating a new warrant exception in the process. The majority says *Mario W.* held that a warrant is not required to create a DNA profile if there is probable cause or reasonable suspicion to believe an individual committed another crime. *See* Maj. Op. ¶ 23. The heading of that section of the majority opinion says, "Under *Mario W.*, the Creation of a DNA Profile from State-Held Evidence Is a Search, but *It Does Not Require a Warrant If There Is Probable Cause or Reasonable Suspicion*." Maj. Op. p.7 (emphasis added). To be sure, *Mario W.* says that its analysis might differ with probable cause or reasonable suspicion. 230 Ariz. at 129 ¶ 31; *see infra* ¶ 83 (using probable cause as one factor in the search analysis). But *Mario W.* did not create a new probable cause or reasonable suspicion exception to the warrant requirement for DNA profiles. Such an exception could diminish—if not swallow—the warrant requirement. It is also inconsistent with the majority's later conclusion that a Fourth Amendment violation occurred here (the majority says there was probable cause that Mitcham committed another crime (murder)).

¶59 There is a more direct route to resolving the constitutional issue—the route both parties urge us to take. Whether the State violated the Fourth Amendment turns, not on reasonableness or the existence of a new warrant exception, but on whether the State conducted a new search in 2018. Taking that route requires answering only two questions. Does *Mario W.*'s holding that the creation of a juvenile's DNA profile is a search unto itself govern every time the government creates a DNA profile? If not, did Mitcham have a reasonable expectation of privacy in 2018 in the non-coding regions of DNA he provided in 2015?

## II.

¶60 *Mario W.* did not establish a universal rule that creating a DNA profile is always a search separate from DNA extraction. *Mario W.* did not analyze expectations of privacy in DNA in all circumstances—an impossible task. Rather, *Mario W.* involved a unique situation—a statute

requiring juveniles merely charged with certain offenses to undergo DNA profiling. *See* 230 Ariz. at 123 ¶ 1. The statute mandated DNA profiling when there was not even reasonable suspicion "that a juvenile committed another offense for which the DNA profile might provide investigative assistance." *Id.* at 125 ¶ 9.

**¶61** Determining the reasonable expectations of juveniles in the non-investigative circumstances in *Mario W.* is a far cry from what we analyze here—the privacy expectations of an adult who was convicted of the crime for which he provided blood when the police later, with probable cause and for investigational purposes, create a DNA profile from that sample. *Mario W.* does not attempt to answer, let alone dictate the answer to, that Fourth Amendment dilemma—either for or against Mitcham. We should read general language in judicial opinions "as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004). *Mario W.*'s two-search holding stems from the unique circumstances in which it was created and not the dissimilar circumstances we face.

**¶62** I am not alone in concluding *Mario W.* is inapplicable here. One of Mitcham's *amici* refers to *Mario W.* as conducting a "troublesome 'two-tiered' analysis" and asks us to apply a "holistic approach" instead. Similarly, Mitcham repeatedly argues that *Mario W.* does not apply. For example, he asserts "*Mario W.* is largely inapplicable because it did not address . . . warrantless DNA searches for criminal investigation purposes." Mitcham also argues that "[t]his case does not involve a challenge" like that in *Mario W.*, and therefore "this Court need not address whether *Mario W.* must be overruled." I agree with Mitcham on both points.

### III.

**¶63** If *Mario W.* does not resolve the Fourth Amendment question, where does that leave us? Here is where: in 2018, Mitcham did not have a reasonable expectation of privacy in the non-coding regions of DNA he provided in 2015, and the State therefore did not conduct a new search when it created a DNA profile. With no search, there was no Fourth Amendment violation.

### A.

**¶64** The Fourth Amendment, binding on the State through the Fourteenth Amendment, provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. As the text says, the right protects against "unreasonable searches and seizures." U.S. Const. amend. IV. If neither a search nor a seizure occurs, the Amendment has no role. This is a search case; Mitcham does not frame this as a seizure case.

**¶65** There are two approaches to determining whether a "search" occurs—the property approach and the privacy approach. *See Soldal v. Cook County*, 506 U.S. 56, 64 (1992) ("[P]roperty rights are not the sole measure of Fourth Amendment violations."). Mitcham relies only on the privacy approach.

### B.

**¶66** The privacy approach—Justice Harlan's creation in a concurring opinion in *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)—asks whether "an individual 'seeks to preserve something as private' and that expectation is 'one that society is prepared to recognize as reasonable.'" *State v. Mixton*, 250 Ariz. 282, 286 ¶ 13. "[O]fficial intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018).

**¶67** The "reasonable expectation of privacy" test can be difficult to apply in practice. One Fourth Amendment scholar has observed that "[t]reatises and casebooks struggle to explain the test," with "some suggest[ing] that the only way to identify when an expectation of privacy is reasonable is when five Justices say so." Orin S. Kerr, *Four Models of Fourth Amendment Protection*, 60 Stan. L. Rev. 503, 505 (2007). To avoid letting the test lead us into judicial policymaking, we should treat it as posing a descriptive question: whether society recognized the proffered expectation of privacy at the time of the alleged search. *See Carpenter*, 138 S. Ct. at 2245 (Thomas, J., dissenting) ("As written, the *Katz* test turns on society's actual, current views about the reasonableness of various expectations of privacy."). And we should answer the "reasonable expectation" question by looking to pre-existing law—statutes, regulations, and prior Fourth Amendment and common law precedent. *See* Baude & Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1852 (2016) ("[T]he positive law model calls for the bread and butter of the legal profession—doctrinal analysis. It is a task that is both more appropriate to judges' roles and more suited to their capabilities.").

## C.

¶68        There are four factors that, when existing together[7], dictate that Mitcham did not have a reasonable expectation of privacy in 2018 in the non-coding regions of DNA in the 2015 blood sample.

### 1.

¶69        The State used only the non-coding regions of Mitcham's DNA to determine whether it matched non-coding regions in DNA found at the murder scene.  The non-coding regions of DNA, also known as "junk DNA," "while useful and even dispositive for purposes like identity, does not show more far-reaching and complex characteristics like genetic traits." *King*, 569 U.S. at 443.  Forensic analysis of the non-coding region focuses on "short tandem repeats" ("STRs") scattered throughout the genetic code.  *Id.* The size and frequency of STRs "along a strand of DNA" are known as alleles.  *Id.*  Forensic DNA analysis uses multiple alleles "to ensure that a DNA profile matches only one individual."  *Id.*  Using STRs to analyze alleles in non-coding regions, "makes it possible to determine whether a biological tissue matches a suspect with near certainty."  *Id.*

¶70        The State's comparison between an STR-generated DNA profile and a fingerprint is apt.  Like a fingerprint, the information provided in an STR-generated DNA profile tells you nothing about an individual, let alone anything private.  Instead, the sequence of numbers produced is so unique that it can be used to connect two genetic samples, thereby confirming identification.  *Cf. United State v. Mitchell*, 652 F.3d 387, 412 (3d Cir. 2011) ("[B]ecause DNA profiles developed pursuant to the DNA Act function as 'genetic fingerprints' used only for identification purposes, arrestees and pretrial detainees have reduced privacy interests in the information derived from a DNA sample.").  This Court previously compared DNA testing and fingerprints in rejecting a Fourth Amendment challenge:  "[DNA] tests are akin to taking fingerprints of suspects, which may be used to identify perpetrators of past and future crimes or to exonerate innocent persons." *In re Leopoldo L.*, 209 Ariz. 249, 254 (App. 2004) (Timmer, J.).  As *King* explains, "[t]he additional intrusion upon the arrestee's privacy beyond that associated with fingerprinting is not significant[.]"  569 U.S. at 459.

---

[7]        If any of the four factors were to change or become inapplicable, the conclusion would likely change.

¶71 Where a DNA sample differs from a fingerprint is that a DNA sample *could* be used to discover far more personal information about an individual.  I sympathize with *amici*'s concern that DNA could be used (or abused) to discover a great amount of personal information.  As *amici* puts it, "[a]s technology and research continue to advance, DNA analysis will allow ever-greater incursions into our privacy."  *Amici* also contends that DNA technology has advanced such that "STR profiles today yield information far beyond identity," and I have no reason to doubt that statement.  If the State had used the 2015 blood sample to obtain health, medical, or other genetic information, the privacy analysis would be much different.  If the State begins using DNA in an intrusive manner in future cases, the analysis must be adjusted to account for the greater privacy interests thereby implicated.

¶72 But the misuse of DNA is not at issue.  Mitcham does not suggest the State used the 2015 DNA sample for anything other than a limited STR analysis.  When that analysis occurred, the State already knew the DNA being analyzed belonged to Mitcham.  There is no indication the State did anything other than use STRs to discover the unique pattern of alleles associated with Mitcham's DNA—that is not private information.  The State then compared that unique pattern with the unique pattern in DNA found at the crime scene.   That comparison showed a match, but it again revealed nothing private about Mitcham.  The limited nature of the DNA profile created cuts significantly against any expectation of privacy.

### 2.

¶73 A search occurs when police draw blood.  The U.S. Supreme Court has "long recognized that a compelled intrusion into the body for blood to be analyzed for alcohol content must be deemed a Fourth Amendment search." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) (cleaned up); *see also Birchfield v. North Dakota*, 579 U.S. 438, 463 (2016) (explaining that although a breath test does not implicate significant privacy concerns, "[b]lood tests are a different matter").  Thus, unless an exception applies, like exigent circumstances (*see Schmerber v. California*, 384 U.S. 757 (1966)) or consent (*see State v. Valenzuela*, 239 Ariz. 299, 302 ¶ 11 (2016)), police must obtain a warrant to draw blood.

¶74 Mitcham does not challenge the legality of the 2015 blood draw—Mitcham expressly consented to that draw.  *See* A.R.S. § 28-1321(A) (implied consent law); *Carrillo v. Houser*, 224 Ariz. 463, 463 ¶ 1 (2010).  In his briefing, Mitcham refers to the 2015 blood draw as "a lawfully obtained

blood vial." In 2015, the State legally came into possession of the blood sample later used again in 2018.

**3.**

¶75 Mitcham also could not have reasonably expected that the State was required to destroy his blood sample. In its suppression ruling, the superior court observed that Mitcham signed a notice stating that the blood he provided "would be destroyed after 90 days if a request for testing was not made," but Mitcham's blood "was never destroyed." The notice, however, only gave Mitcham the opportunity to have an independent laboratory test a "sample" of blood. The notice indicated that the "sample" would be destroyed if a request for testing was not received within 90 days.

¶76 The notice did not create a reasonable expectation in destruction of *all* of Mitcham's blood. The text of the notice did not indicate that all blood drawn would be destroyed after 90 days; it indicated only that one of the samples would go. Moreover, it would not have been reasonable for Mitcham to otherwise believe that the State would discard evidence of a potential crime (DUI) within 90 days, particularly when Mitcham's prosecution remained pending well after 90 days.

¶77 The 2015 analysis of the blood reflected that Mitcham had a blood-alcohol level of .242. Once that result returned in May 2015, the lawfully obtained blood became evidence of a crime, and the State was entitled to maintain possession. Mitcham concedes "that blood evidence seized during a DUI, whether consensual or through a warrant, need not be returned, as it may be used as evidence in the DUI offense." Mitcham correctly cites A.R.S. § 13-3920(B)(2) for that concession. That statutory provision provides that law enforcement must return seized items within ten days unless the item "is sought to be used for evidence." A.R.S. § 13-3920(B)(2). When the item is criminal evidence, the statute contains no requirement or deadline for returning the item. Mitcham is deemed to know the law, and the law allowed the State to keep possession of the 2015 blood samples during pendency of the DUI prosecution.

¶78 Once Mitcham pled guilty to the DUI charges in February 2016, the State could lawfully keep the 2015 blood samples, and any limitation on use based solely on the scope of prior consent dissipated. Mitcham provides no support—and I have not independently located any—for the proposition that a criminal defendant is entitled to demand return or destruction of blood representing the primary evidence in a convicted crime. The prime evidence supporting Mitcham's 2016 DUI

conviction was the 2015 blood sample. Even if Mitcham had a right to demand destruction, or limit the use, of the blood prior to conviction or upon acquittal, any such right was lost once he pled guilty. *Cf. People v. King*, 232 A.D.2d 111, 118 (N.Y. App. Div. 1997) (rejecting an argument that a blood sample could not be used to investigate a second crime because "a defendant does not have a right to the automatic return of property seized in any criminal case absent a proper demand or some legal action"). Thus, the State maintained lawful possession of Mitcham's blood sample at the time it created the 2018 DNA profile.

¶79        Several courts have held that when the government has lawful possession of a blood sample stemming from one crime, the government can use the sample to investigate another crime. *See, e.g., State v. Emerson*, 981 N.E.2d 787, 792-93 ¶ 24 (Ohio 2012) (citing cases from eight other courts to support the holding that "a person has no reasonable expectation of privacy in his or her DNA profile extracted from a lawfully obtained DNA sample"); *Washington v. State*, 653 So.2d 362, 364 (Fla.1994), ("[O]nce [blood] samples were validly obtained, albeit in an unrelated case, the police were not restrained from using the samples as evidence in the murder case."); *State v. Benefield*, 103 A.3d 990, 100 (Conn. App. Ct. 2014) ("[T]here is no constitutional violation of a defendant's reasonable expectation of privacy in bodily fluids that are legally obtained in one criminal investigation and subsequently used in an unrelated criminal investigation."); *State v. Hauge*, 79 P.3d 131, 145 (Haw. 2003) ("[T]he number of investigations in connection with which the [police] tested [defendant's] blood, once the blood is lawfully obtained, is irrelevant to the question whether the [police] violated some reasonable expectation of privacy.").

¶80        The foregoing decisions are undoubtedly correct when the second use of the blood sample occurs *after conviction* for the first crime. Here, the State did not use the 2015 blood sample until 2018, two years *after* Mitcham pled guilty to DUI.

**4.**

¶81        There is a fourth factor present—even before the DNA profile, the State had probable cause to arrest Mitcham for a serious felony offense and reasonable cause to believe the DNA sample would help confirm (or exclude) Mitcham as the source of DNA at the crime scene. Returning to the fingerprint analogy, the U.S. Supreme Court has explained that an individual can be detained for fingerprinting "if there is reasonable suspicion that the suspect has committed a criminal act, [and] if there is a reasonable basis for believing that fingerprinting will establish or negate

the suspect's connection with that crime." *Hayes v. Florida*, 470 U.S. 811, 817 (1985); *cf.* A.R.S. § 13-3905 (allowing courts, on less than probable cause, to authorize police to detain an individual to obtain biological samples for identification purposes).

¶82         In *Mario W.*, the court, citing *Hayes*, thought it relevant that the State wanted to analyze DNA without "even reasonably suspect[ing] that a juvenile committed another offense for which the DNA profile might provide investigative assistance." 230 Ariz. at 125 ¶ 9. And the court suggested its analysis would be different if there was probable cause or reasonable suspicion to believe an individual committed an uncharged offense. *Id.* at 129 ¶ 31.

¶83         Here, there was probable cause that Mitcham committed murder. As the majority explains, "the evidence independent of that DNA profile provided sufficient probable cause to authorize Mitcham's arrest." Maj. Op. ¶ 46. At oral argument, Mitcham conceded that, based on a familial DNA analysis and the location of their residences, the State had probable cause to arrest both Mitcham and his brother. *Id.* ¶ 45. It is clear, therefore, that the State could arrest Mitcham first based on his prior arrest record and the location of his home. *Cf. Maryland v. Pringle*, 540 U.S. 366, 372–73 (2003) (officer performing traffic stop had probable cause to arrest all three occupants of vehicle after cocaine was found in backseat of car behind armrest).

¶84         There was also reasonable cause to believe a DNA profile would provide investigative assistance by supporting or negating Mitcham's presence at the murder scene. Upon Mitcham's arrest, Arizona law permitted the State to perform a buccal swab and analyze the resulting DNA. *See* A.R.S. § 13-610(K). No one in Mitcham's position would think the State, upon obtaining probable cause to arrest for a serious felony offense, could not first analyze blood it *already lawfully possessed* to confirm or negate a connection to the murder scene. Though we now know the results of the DNA analysis in this case, and thus have the benefit of hindsight, there can be little doubt that Mitcham would have preferred the DNA analysis to being arrested if the analysis would have *negated* his presence at the murder scene. Thus, unlike in *Mario W.*, obtaining a DNA profile had an investigative (and potentially exonerating) purpose.

### 5.

¶85         In sum, Mitcham did not have a reasonable expectation of privacy in 2018 in (1) the non-coding regions of DNA contained (2) in a

blood sample lawfully obtained in 2015 and (3) then lawfully kept following his 2016 conviction for DUI when (4) the State had probable cause to believe he committed murder and reasonable cause to believe the sample would help confirm or negate his presence at the crime scene. Consequently, creating a DNA profile in 2018 was not a "search" requiring a warrant.

**IV.**

¶86        I respectfully concur in the judgment.



AMY M. WOOD • Clerk of the Court
ØŒOÒŀ PJL