IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**ANTHONY BENARD PRIMOUS,**
*Appellant.*

---

No.  CR-16-0205-PR
Filed May 23, 2017

---

Appeal from the Superior Court in Maricopa County
The Honorable Pamela S. Gates, Judge
No.  CR2012-005697
**REMANDED**

Opinion of the Court of Appeals, Division One
239 Ariz. 394, 372 P.3d 338 (App. 2015)
**VACATED**

---

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic Draye, Solicitor General, Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section, Robert A. Walsh (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Maricopa County Public Defender's Office, Carlos Daniel Carrion (argued), Deputy Public Defender, Phoenix, Attorneys for Anthony Benard Primous

David J. Euchner, Pima County Public Defender's Office, Tucson, Josephine Bidwill, The Bidwell Law Firm, PLLC, Phoenix, Kathleen E. Brody (argued), American Civil Liberties Union Foundation of Arizona, Phoenix, Attorneys for Amici Curiae Arizona Attorneys for Criminal Justice and American Civil Liberties Union Foundation of Arizona

_____

JUSTICE BOLICK authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL and BERCH (RETIRED), and JUDGES MILLER and MACKEY joined.*

JUSTICE BOLICK, opinion of the Court:

**¶1**　　　　We consider whether police can form a reasonable suspicion that an individual is engaged in criminal activity and is armed and dangerous, thus justifying a pat-down search, based merely on where they encounter the individual (e.g., a "high-crime neighborhood") and a companion's flight.  Viewing the totality of the circumstances, we hold that the police here did not have an individualized reasonable suspicion sufficient to justify the pat-down search of Anthony Benard Primous; therefore, the trial court erred in denying his motion to suppress evidence found in the search.

## I.　　BACKGROUND

**¶2**　　　　One February morning, five Phoenix police officers went to an apartment complex in a high-crime neighborhood.  They were looking for a suspect with an outstanding warrant who they believed carried and sold weapons.

**¶3**　　　　Officers Ohland and Casillas approached four men who were talking outside the apartment complex, which had external surveillance cameras.  Two were standing and two were seated, including Primous, who held an infant on his lap.  None of the men were the suspect.

_____

* Justices Ann A. Scott Timmer, Andrew W. Gould, and John R. Lopez IV recused themselves.  Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Rebecca White Berch, Justice of the Arizona Supreme Court (Retired), the Honorable Michael O. Miller, Judge of the Arizona Court of Appeals, Division Two, and the Honorable David L. Mackey, Presiding Judge of the Yavapai County Superior Court, are designated to sit in this matter.

¶4 Ohland and Casillas identified themselves as police officers and asked the men how they were doing. Both officers thought one of the men appeared nervous. When that person noticed three other officers approaching, he ran and was chased by those officers. The other men remained and made no sudden moves. Primous remained seated with the infant on his lap. He did not appear nervous or to have a weapon.

¶5 Ohland and Casillas announced they were going to pat down the men for weapons. Before the frisk commenced, one of the men handed Ohland a baggie of marijuana. Ohland then patted down all three men. The search revealed no weapons, but Ohland felt an object in Primous's pocket, which turned out to also be a baggie of marijuana.

¶6 Primous was charged with misdemeanor marijuana possession. He moved to suppress the marijuana as the product of an unlawful search. After an evidentiary hearing, the trial court concluded the "officers had a reasonable suspicion that criminal activity may be afoot" and "appropriately decided to perform a pat-down search for officer safety." Assessing the "totality of the circumstances," the court noted "the conduct of the one individual who ran, coupled with the reason for [the officers'] encounter with the group, the dangerousness of the area, the number of individuals remaining compared to the number of officers, and the cameras." Based on those factors, the trial court denied the motion. Primous was convicted following a bench trial and placed on one year of unsupervised probation.

¶7 The court of appeals affirmed. The court applied a two-step analysis to assess the propriety of the frisk: whether officers reasonably suspected that the person who was searched (1) was committing or had committed an offense and (2) was armed and dangerous. *State v. Primous*, 239 Ariz. 394, 396 ¶ 9, 372 P.3d 338, 340 (App. 2016) (citing *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)). As to the second prong, the court considered "whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

¶8 The court of appeals framed the issue as "whether the suggestion of wrongdoing created by Defendant's companions justified a

frisk of Defendant, who remained seated and gave no indication of complicity in either the flight or the drug possession." *Id.* ¶ 11. The court concluded that "[c]ompanionship with a suspected criminal may, in view of the totality of the circumstances, justify a protective stop and frisk even absent a particularized reasonable suspicion that the person to be searched is committing or has committed a crime." *Id.* at 397 ¶ 13, 372 P.3d at 341. Based on the facts identified by the trial court, the court of appeals determined that the frisk was justified and affirmed the trial court's ruling. *Id.* at 397–98 ¶¶ 14–15, 372 P.3d at 341–42.

**¶9** We granted review because identifying the circumstances that may justify a pat-down search involves recurring legal issues of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II. DISCUSSION

**¶10** We review rulings on motions to suppress for abuse of discretion, considering only the evidence presented at the suppression hearing and viewing it in the light most favorable to sustaining the trial court's ruling. *State v. Butler*, 232 Ariz. 84, 87 ¶ 8, 302 P.3d 609, 612 (2013). "An error of law constitutes an abuse of discretion." *State v. Bernstein*, 237 Ariz. 226, 228 ¶ 9, 349 P.3d 200, 202 (2015). We review the constitutionality of the frisk de novo. *See State v. Havatone*, 241 Ariz. 506, 509 ¶ 11, 389 P.3d 1251, 1254 (2017).

### A. The Frisk

**¶11** Although a frisk is less intrusive than a full-body search, the Fourth Amendment prohibits any search of an individual unless the police have a reasonable belief that crime is afoot and the individual is armed and dangerous. The controlling Arizona case is *State v. Serna*, 235 Ariz. 270, 331 P.3d 405 (2014), which neither the State nor the court of appeals cited. There this Court held that in the context of a consensual encounter, "an officer may frisk an individual only when the officer possesses both a reasonable suspicion that *the person to be searched* has engaged or is about to engage in criminal activity and a reasonable belief that the person is armed and dangerous." *Id.* at 276 ¶ 28, 331 P.3d at 411 (emphasis added). Reasonable

suspicion in turn requires "a particularized and objective basis" for the suspicion. *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

¶12 In *Serna*, police were patrolling a known gang neighborhood at night and encountered a man and woman standing in the middle of the street. 235 Ariz. at 271 ¶ 2, 331 P.3d at 406. As the patrol car approached, the duo walked in opposite directions, and the officers engaged defendant Serna in a consensual encounter. *Id.* He was polite and cooperative. *Id.* at 272 ¶ 3, 331 P.3d at 407. The officers noticed a bulge in his waistband, which Serna disclosed was a gun. *Id.* The officers removed the gun and patted him down. *Id.* In response to the officers' subsequent questioning, Serna admitted that he had a felony conviction. *Id.* This Court reversed the trial court's denial of Serna's motion to suppress the gun in a prosecution for prohibited possession of a firearm by a convicted felon. *Id.* at ¶ 4, 277 ¶ 30, 331 P.3d at 407, 412. Because there was no reasonable suspicion that Serna was engaged in criminal activity, we concluded that "the mere presence of a weapon does not afford officers constitutional permission to search weapons-carrying individuals. To conclude otherwise would potentially subject countless law-abiding citizens to pat-downs solely for exercising their right to carry a firearm." *Id.* at 275 ¶ 23, 331 P.3d at 410.

¶13 The State seemingly agrees that nothing Primous did or said gave rise to a reasonable suspicion that he was engaged in criminal activity or was armed or dangerous. He was not the suspect police were seeking. When police approached, he was seated with an infant on his lap, talking with three other men. He did not react in a suspicious manner to the police encounter or when one of the other men ran away. He was cooperative. In sum, Primous gave the police no justification to search him. Any other justification could only have arisen from the surrounding circumstances.

¶14 In approving the frisk, the trial court relied on five circumstances, the "totality" of which it considered to give rise to reasonable suspicion that "crime was afoot": (1) the individual who ran, (2) the reason for the police encounter with the group, (3) the dangerousness of the area, (4) the number of individuals remaining at the scene compared to the number of officers, and (5) the surveillance cameras. From these same circumstances, the court of appeals concluded "we cannot say that [the officer] unreasonably suspected that Defendant might be armed and dangerous." *Primous*, 239 Ariz. at 397 ¶ 14, 372 P.3d at 341. We disagree.

¶15        What is striking about the five factors relied upon by the courts below is that Primous had control over none of them. Although "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or others was in danger." *Terry*, 392 U.S. at 27. The ultimate inquiry is whether police have reasonable suspicion that the *person searched* was either engaged in criminal activity or armed and dangerous. *Serna*, 235 Ariz. at 276 ¶ 28, 331 P.3d at 411. The surrounding circumstances here do not sufficiently suggest that Primous was engaged in crime or that he was armed and dangerous to justify a pat-down for weapons.

¶16        The court of appeals justified the frisk largely on Primous's fleeing companion, holding that "[c]ompanionship with a suspected criminal may, in view of the totality of the circumstances, justify a protective stop and frisk even absent a particularized reasonable suspicion that the person to be searched is committing or has committed a crime." *Primous*, 239 Ariz. at 397 ¶ 13, 372 P.3d at 341 (citing *Trice v. United States*, 849 A.2d 1002, 1004, 1008–09 (D.C. App. 2004); *United States v. Flett*, 806 F.2d 823, 827–28 (8th Cir. 1986)). Thus, "[d]espite Defendant's passivity and the absence of any objective evidence of criminal collusion with his companions," the court of appeals could not "say that [Officer] Ohland unreasonably suspected that Defendant might be armed and dangerous." *Id.* ¶ 14.

¶17        The court of appeals' analysis understates the personalized and particularized showing required by the Fourth Amendment. Analysis of the United States Supreme Court's jurisprudence shows that more is required than appears here. In *Ybarra v. Illinois*, 444 U.S. 85 (1979), for example, a search warrant was executed for a bar and bartender suspected of selling heroin. The police frisked all of the bar's patrons for weapons, finding heroin in defendant Ybarra's pocket. *Id.* at 88–89.

> Upon entering the tavern, the police did not recognize Ybarra and had no reason to believe that he had committed, was committing, or was about to commit any offense under state or federal law. Ybarra made no gestures indicative

of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers. In short, the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale.

*Id.* at 90–91. The Court concluded that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91.

¶18 Moreover, the police "neither recognized [Ybarra] as a person with criminal history nor had any particular reason to believe that he might be inclined to assault them." *Id.* at 93. His "hands were empty" and he "gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening." *Id.* The Court thus concluded that the frisk "was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate for a pat-down of a person for weapons." *Id.* at 92–93.

¶19 As in *Ybarra*, the facts surrounding the police encounter with Primous did not generate the requisite personalized and particularized reasonable suspicion that he was engaged in crime or was presently armed and dangerous. The encounter took place in broad daylight. None of the men were the suspect who occasioned the police presence. Once one of the men fled, the remaining men, including Primous who was seated with an infant on his lap, exhibited no hostile, furtive, or even uncooperative behavior. Primous had been talking with the man who ran, but that mere proximity or companionship did not suggest Primous was engaged in criminal activity or dangerous. The surveillance cameras could have been intended to protect apartment dwellers against crime rather than the police, and in any event did not suggest Primous was dangerous. In sum, nothing about the environment gave rise to a reasonable suspicion that Primous was involved in a crime, much less that he was armed and dangerous to police officers.

¶20        Nor were Primous and his companions acting in concert in such a way as to give rise to a reasonable suspicion that they all were engaged in a criminal activity and might be armed and dangerous. *See Flett*, 806 F.2d at 828 (holding that frisk was appropriate where subject of arrest was an "enforcer" for a violent gang and companion was dressed in gang attire and identified as a member); *cf. Bernini v. City of St. Paul*, 665 F.3d 997, 1003–04 (8th Cir. 2012) (arrest appropriate where the "group was acting as a unit" and "the group, as a whole, was committing one or more offenses"). Here, Primous and his companions were engaged in no apparent concerted action other than conversation.

¶21        Cases relied upon by the court of appeals or the State are either distinguishable or overtaken by *Ybarra*. *See, e.g.*, *United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971) (pre-*Ybarra* case allowing frisk of a criminal's companion at time of arrest); *United States v. Bell*, 762 F.2d 495, 500–02 (6th Cir. 1985) (holding search was permissible where car containing defendant was driven by a person suspected of being armed and dangerous, defendant generally matched description of criminal accomplice, defendant was uncooperative, and there was risk to bystanders in the crowded parking lot); *Flett*, 806 F.2d at 828 (focusing "not [on] whether the officer had an indication that the person armed was dangerous, but rather, whether the officer reasonably perceived the subject of the frisk as potentially dangerous"); *Trice*, 849 A.2d at 1008 (noting that defendant "appeared to be the companion of a potentially violent, fleeing criminal and not a mere bystander"). Reaffirming and applying the clear two-part test set forth in *Serna*, we conclude that the facts here were insufficient to support a reasonable suspicion that Primous was involved in a crime and was armed and dangerous. Thus, unsupported by reasonable suspicion, the frisk of Primous violated the Fourth Amendment.

¶22        The amici who support Primous ask us to categorically exclude the dangerousness of the surroundings from an officer's calculus "unless officers can point to a specific attribute of the neighborhood relevant to the particular person and criminal activity under investigation," on the grounds that such factors are a proxy for race. We decline to do so.

¶23        Although the fact that the encounter occurred in a dangerous neighborhood does not by itself authorize police to pat down people they encounter during an investigation, it is not irrelevant in determining

whether an individual suspect is involved in criminal activity and armed and dangerous. In *Illinois v. Wardlow*, 528 U.S. 119 (2000), the United States Supreme Court sustained a frisk by police officers who were patrolling an area known for heavy narcotics trafficking where the defendant fled upon seeing the officers. The Court held that "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis," but observed that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.* at 124.

¶24 In *Wardlow*, ample suspicion that the defendant was engaged in criminal activity and was armed and dangerous arose not only from his presence in a high-crime area, but also "his unprovoked flight upon noticing the police." *Id.* By contrast, here the question is whether reasonable suspicion justified frisking Primous not because of anything he did or said but because *someone else* with whom he was conversing fled when police approached, while Primous remained seated and cooperative. The fact that the encounter occurred in a high-crime neighborhood was insufficient to justify the search of an individual who gave no indication that he was involved in a crime or posed an imminent threat to the officers. The Fourth Amendment shields such individuals from pat-downs regardless of their neighborhood. This rule amply protects law-abiding residents of high-crime neighborhoods from being searched solely because of their surroundings.

## B. Motion to Suppress

¶25 The State also argues that the marijuana baggie illegally seized from Primous should not be suppressed as evidence because there would be no deterrent value given that police officers will take whatever steps they deem necessary to protect their safety. *See, e.g.*, *Ybarra*, 444 U.S. at 108 (Rehnquist, J., dissenting) (observing that excluding evidence will have little deterrent effect where frisk is based "on an officer's well-honed sense of self-preservation"). We find the argument unpersuasive. Suppressing the illegally seized evidence here helps ensure that frisks are based upon the legitimate factors outlined above and do not devolve into a de facto policy of frisking all individuals with whom police have investigative encounters in high-crime neighborhoods. *Cf. Herring v. United*

*States*, 555 U.S. 135, 144 (2009) (exclusionary law serves to deter "recurring or systemic" negligence). "While we understand the need for police officers to protect themselves in the course of their duties, we must balance that weighty interest against the 'inestimable right' of citizens to be free from unreasonable governmental searches and seizures." *Serna*, 235 Ariz. at 276 ¶ 29, 331 P.3d at 411 (citing *Terry*, 392 U.S. at 8–9).

## III.    CONCLUSION

**¶26**         Because the sole evidence supporting Primous's conviction was the product of an illegal search, we vacate the court of appeals' opinion and reverse Primous's conviction and probationary term.