IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————

**STATE OF ARIZONA,**
*Appellant,*

*v.*

**IAN MITCHAM,**
*Appellee.*

———————

No. CR-23-0236-PR
**Filed December 17, 2024**

———————

Appeal from the Superior Court in Maricopa County
The Honorable Roy C. Whitehead, Judge
No. CR2018-118086-001

**REVERSED AND REMANDED**

———————

Opinion of the Court of Appeals,
Division One
256 Ariz. 104 (App. 2023)

**VACATED**

———————

COUNSEL:

Rachel H. Mitchell, Maricopa County Attorney, Nick Klingerman (argued), Special Deputy County Attorney, Ryan Green, Deputy County Attorney, Maricopa County Attorney's Office, Phoenix, Attorneys for State of Arizona

Gary Kula, Maricopa County Public Defender, Mikel Steinfeld (argued), Martha Barco Penunuri, Jeffrey A. Kirchler, Richard D. Randall, Deputy

Public Defenders, Phoenix, Attorneys for Ian Mitcham

David J. Euchner (argued), Pima County Public Defender's Office, Grant D. Wille, Ralls, Wille, & Coomer, P.C., Tucson, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

Kristin K. Mayes, Arizona Attorney General, Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals, Michael O'Toole, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General

Jared G. Keenan, Lauren K. Beall, American Civil Liberties Union Foundation of Arizona; Vera Eidelman, American Civil Liberties Union Foundation, New York, NY, Attorneys for Amici Curiae American Civil Liberties Union of Arizona and American Civil Liberties Union

---

CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which VICE CHIEF JUSTICE LOPEZ, JUSTICES BOLICK, BEENE, KING, BRUTINEL (RETIRED), and JUDGE SKLAR joined. *

---

CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1        After police arrested Ian Mitcham for driving under the influence of alcohol ("DUI"), he consented to a blood test to determine alcohol concentration or drug content.   Years later, police suspected Mitcham of committing a murder, and they still had Mitcham's blood from the DUI arrest.   Without obtaining a warrant, they extracted a DNA profile from that blood, which linked Mitcham to the murder.

---

*   Justice Brutinel retired after oral argument in this case but nevertheless participated in deciding this opinion.   Justice Montgomery is recused from this matter.   Pursuant to article 6, section 3 of the Arizona Constitution, Judge Jeffrey Sklar of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

¶2　　　　We decide that the police violated Mitcham's Fourth Amendment rights by conducting the warrantless search. Because the inevitable discovery exception to the exclusionary rule applies, however, we hold that the trial court erred by suppressing the DNA evidence.

**BACKGROUND**

¶3　　　　In January 2015, Scottsdale Police arrested Mitcham for DUI. A police officer advised Mitcham that Arizona law required him to submit to a blood test to determine alcohol concentration or drug content. The officer explained that if Mitcham refused to consent to testing, the state would suspend his driver's license for twelve months. Mitcham consented.

¶4　　　　The police drew two vials of blood from Mitcham and used one vial for their test. They made the second vial available to Mitcham to allow him to independently test his blood. Mitcham signed a "Destruction Notice," acknowledging that police would destroy the second vial if he did not ask for it within ninety days. Mitcham never asked for the second vial, but the police did not destroy it. Mitcham was ultimately convicted of a misdemeanor DUI.

¶5　　　　Tragically, one month after Mitcham's DUI arrest, Allison Feldman was found murdered in her Scottsdale home. The police collected biological swabs from the scene, developed a male DNA profile, and uploaded it into the National DNA Index System ("NDIS") using the Combined DNA Index System ("CODIS"). *See* A.R.S. § 41-2418(A) (establishing Arizona's DNA identification system). CODIS is a software program maintained by the Federal Bureau of Investigation that "link[s] DNA profiles culled from federal, state, and territorial DNA collection programs," *United States v. Kriesel*, 508 F.3d 941, 944 (9th Cir. 2007), and searches the NDIS database of DNA profiles taken from convicted offenders, among others. *See* 34 U.S.C. § 12592(a) (authorizing the establishment of a national DNA index); *see also Lockett v. Wray*, 271 F. Supp. 3d 205, 209 (D.D.C. 2017) (relating expert descriptions of NDIS and CODIS). CODIS did not return a match, and Feldman's murder remained unsolved for several years.

¶6　　　　In 2017, police initiated a "familial DNA" investigation on the unknown-male DNA profile by asking the Arizona Department of Public Safety ("DPS") to search Arizona's DNA identification system to determine

whether anyone incarcerated by the state is related to that unknown male. *See* § 41-2418(A). Through this investigation, DPS identified Mitcham's incarcerated brother as closely related—most likely through a parent-child or sibling relationship—to the man whose DNA was collected at the murder scene. The police then discovered that the inmate had two sons and three brothers, including Mitcham. Only Mitcham and one other brother lived in the Phoenix area.

¶7        The police focused their investigation on Mitcham. An investigating officer reviewed Mitcham's 2015 DUI arrest records and learned that both vials of blood taken from Mitcham were still in police possession. Without obtaining a warrant, the police analyzed the blood in the second vial and created Mitcham's DNA profile. On April 5, 2018, the police crime lab determined that Mitcham's profile matched the unknown-male DNA profile taken from Feldman's house.

¶8        Days later, the trial court issued search warrants permitting officers to search Mitcham's home and seize certain items; place a GPS tracking device on his car; and obtain buccal samples from Mitcham for purposes of DNA profiling. The affidavits supporting the warrant applications described the circumstances leading the police to Mitcham and stated that officers had used the blood sample taken in the 2015 DUI arrest to match Mitcham's DNA with the unknown-male DNA profile from the murder scene.

¶9        On April 10, police collected buccal swabs from Mitcham pursuant to the search warrant. The police created another DNA profile from this sample, which again matched the unknown-male DNA profile taken from the murder scene. On April 18, a grand jury indicted Mitcham for first degree murder, second degree burglary, and sexual assault.

¶10        On July 7, 2022, Mitcham moved the trial court to suppress both (1) the DNA evidence gathered from the second vial taken during his 2015 DUI arrest; and (2) the DNA evidence extracted from the buccal swabs collected pursuant to the 2018 search warrant. After an evidentiary hearing, the court granted the motion, reasoning that the warrantless search of the second vial of blood violated the Fourth Amendment, and no exceptions to exclusion applied. It also suppressed the DNA evidence gathered from the buccal swabs pursuant to the warrant, reasoning that the evidence was "the direct result of the improper DNA extraction [in 2018]." The court subsequently stayed proceedings to permit the State to appeal its

ruling.  *See* A.R.S. § 13-4032(6) (permitting the state to appeal "[a]n order granting a motion to suppress the use of evidence").

**¶11**        The court of appeals unanimously reversed, but the judges had different reasons for doing so.  *See State v. Mitcham*, 256 Ariz. 104 (App. 2023).   The majority concluded that although the police had violated Mitcham's Fourth Amendment rights, excluding the DNA evidence was not warranted because the evidence would inevitably have been discovered, and it had an independent source.   *See id.* at 115 ¶¶ 46–47, 51. The concurring judge found no Fourth Amendment violation, explaining that Mitcham did not have a reasonable expectation of privacy in the second vial of blood because it was lawfully in police possession.   *See id.* ¶ 53 (Catlett, J., concurring).

**¶12**        We granted Mitcham's subsequently filed petition for review to determine (1) whether the sequencing of Mitcham's DNA profile from the second vial of blood taken during the 2015 DUI arrest constituted a search and violated Mitcham's rights under the Fourth Amendment; and (2) if so, whether the DNA evidence should be suppressed.   These are potentially recurring issues of statewide importance and therefore merit our review.   We have jurisdiction under article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

**¶13**        We review a trial court's factual findings on a motion to suppress for an abuse of discretion.  *State v. Smith*, 250 Ariz. 69, 80 ¶ 16 (2020).   In doing so, we consider "only the evidence presented at the suppression hearing and [view such evidence] in the light most favorable to sustaining the trial court's ruling."   *State v. Thompson*, 252 Ariz. 279, 290 ¶ 26 (2022) (quoting *State v. Primous*, 242 Ariz. 221, 223 ¶ 10 (2017)).   But we review de novo the trial court's legal determination about whether a search complied with the Fourth Amendment.   *State v. Jean*, 243 Ariz. 331, 334 ¶ 9 (2018).

**A.   The Police Violated Mitcham's Fourth Amendment Rights By Sequencing A DNA Profile From The Second Vial Of Blood Taken During The 2015 DUI Arrest.**

**¶14**        The Fourth Amendment to the United States Constitution "safeguard[s] the privacy and security of individuals against arbitrary

invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). Although Fourth Amendment violations were formerly "tied to common-law trespass," *United States v. Jones*, 565 U.S. 400, 405 (2012), the Supreme Court has recognized that "the Fourth Amendment protects people, not places," *Carpenter*, 585 U.S. at 304 (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). Thus, when an individual "seeks to preserve [something] as private," and that expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" Fourth Amendment protections will apply. *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (alteration in original) (quoting *Katz*, 389 U.S. at 351, 361); *see also Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The touchstone of the Fourth Amendment is reasonableness.").

¶15 A search occurs when the government infringes a privacy interest that society considers to be reasonable. *See State v. Mixton*, 250 Ariz. 282, 286 ¶ 13 (2021). Such an intrusion "generally . . . requires a warrant supported by probable cause." *Carpenter*, 585 U.S. at 304. Warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357 (footnote omitted).

1. A search occurred here.

¶16 The State argues that sequencing Mitcham's DNA from the second vial of blood collected during his 2015 DUI arrest was not a "search" for Fourth Amendment purposes because it already lawfully possessed the blood. To resolve this argument, we begin with this Court's opinion in *Mario W. v. Kaipio*, 230 Ariz. 122 (2012). There, we considered the constitutionality of an Arizona law requiring juveniles accused of committing enumerated offenses to provide law enforcement with a buccal swab for DNA profiling. *Id.* at 123–24 ¶ 1. After sequencing, the DNA profiles were entered into CODIS and Arizona's DNA identification database. *See id.* at 124 ¶ 5. If not ultimately adjudicated delinquent, the juvenile could petition the court for expungement of the profile from the databases. *Id.*

¶17 The Court recognized that the challenged law intruded on a juvenile's privacy by authorizing law enforcement to both physically collect the buccal sample and then process it to extract a DNA profile. *Id.* at 126–27 ¶ 18. We therefore addressed each intrusion separately. *See id.*

at 127 ¶ 20 (noting that a two-tiered analysis was particularly appropriate because DNA profiling is much more intrusive than collecting buccal cells).

**¶18** We first concluded that collecting the buccal sample was constitutionally permissible. *Id.* at 128 ¶ 25. We reasoned that the buccal swab was minimally intrusive, and the state was justified in collecting the sample for identification purposes before the juvenile was adjudicated delinquent because it would lose its chance at collection if the juvenile absconded. *See id.* at 127–28 ¶¶ 22–25.

**¶19** We then reached a different conclusion about the constitutionality of extracting a DNA profile from the buccal sample before the juvenile was adjudicated delinquent. *See id.* at 129 ¶ 32. We recognized that "[t]his second search presents a greater privacy concern than the buccal swab because it involves the extraction (and subsequent publication to law enforcement nationwide) of thirteen genetic markers from the arrestee's DNA sample that create a DNA profile effectively unique to that individual." *Id.* at 128 ¶ 27. Further, we could not perceive any governmental interest in processing the sample and creating the DNA profile before adjudication. *Id.* at 129 ¶ 28. Thus, we concluded that the state's interest in processing the sample before adjudication did not justify the serious intrusion on a juvenile's privacy interest in the DNA profile. *Id.* ¶ 32. Notably, we remarked that:

> [O]ne accused of a crime, although having diminished expectations of privacy in some respects, does not forfeit Fourth Amendment protections with respect to other offenses not charged absent either probable cause or reasonable suspicion. An arrest for vehicular homicide, for example, cannot alone justify a warrantless search of an arrestee's financial records to see if he is also an embezzler.

*Id.* ¶ 31. We therefore disallowed processing the buccal cells to extract a DNA profile before a delinquency adjudication as an unreasonable search under the Fourth Amendment. *See id.* ¶ 32.

**¶20** Although *Mario W.* seemingly resolves that the police in this case conducted a "search" by extracting Mitcham's DNA profile from the second vial of blood taken during his 2015 DUI arrest, the State argues that the Supreme Court in *Maryland v. King*, 569 U.S. 435 (2013), overruled *Mario W.* The State describes *King* as concluding that "sequencing a DNA profile

from lawfully obtained evidence is not a second 'search' within the meaning of the Fourth Amendment." With that characterization, the State argues that *King* overruled *Mario W.* to the extent the latter case concluded that creating a DNA profile from a buccal swab is a "search" under the Fourth Amendment. We disagree.

**¶21** In *King*, the Supreme Court held that a Maryland law authorizing law enforcement officials to "collect DNA samples" from persons arrested for specific felony offenses—committing or attempting to commit violent crimes or burglaries—did not violate the Fourth Amendment. 569 U.S. at 443, 465. The Court found that "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search." *Id.* at 446. But it noted that "[t]he expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope.'" *Id.* at 462 (second alteration in original) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)). It characterized that search as minimally intrusive and outweighed by substantial government interests in identifying arrestees and determining whether they had committed other crimes. *Id.* at 461, 463–64. And the DNA analysis did not reveal any information about the arrestee other than mere identification. *Id.* at 464–65.

**¶22** Importantly, the Court never addressed whether creating a DNA profile from the buccal sample was a separate "search." Instead, the Court examined as a set whether collecting and analyzing a DNA sample taken from felony arrestees violates the Fourth Amendment. *See id.* at 442. Because the collection and analysis occurred in short order as part of "a routine booking procedure" after a suspect's arrest, the Court had no need to address whether the analysis itself was a "search." *See id.* at 465.

**¶23** The conclusion we take from *King* is that "taking and analyzing a cheek swab of the arrestee's DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment." *Id.* at 465–66 ("Upon these considerations the Court concludes that DNA identification of arrestees is a reasonable *search* that can be considered part of a routine booking procedure." (emphasis added)). Thus, *King* overruled *Mario W.* to the extent the latter case held that processing buccal swabs before adjudication violated the juveniles' Fourth Amendment rights. *See Mario W.*, 230 Ariz. at 129 ¶ 32. But *King* did not address whether creating a DNA profile from an arrestee's cell sample itself constitutes a separate search. Thus, we do not view *King*

as overruling *Mario W.*'s conclusion that processing a sample to extract a DNA profile is a search. *Cf. Birchfield v. N.D. Dep't of Transp.*, 579 U.S. 438, 464 (2016) (recognizing that blood can reveal information beyond alcohol and drug content); *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 617–18 (1989) (referring to "the collection and subsequent analysis [of urine samples]" as separate searches under the Fourth Amendment).

**¶24** *Mario W.* remains controlling. We therefore conclude that extracting Mitcham's DNA profile in 2018 from the second vial of blood taken during his 2015 DUI arrest was a "search" under the Fourth Amendment. *See also Skinner*, 489 U.S. at 616 (recognizing that the chemical analysis of a blood sample to obtain physiological data is an invasion of privacy interests apart from the blood draw itself); *State v. Martinez*, 570 S.W.3d 278, 292 (Tex. Crim. App. 2019) (concluding that subsequent testing of blood drawn for medical purposes constituted "a Fourth Amendment search separate and apart from the seizure of the blood by the State"); *People v. Thomas*, 132 Cal. Rptr. 3d 714, 716 (Cal. Ct. App. 2011) ("When an individual is compelled to provide a biological sample for analysis, the collection and subsequent analysis of the sample are treated as separate searches because they intrude on separate privacy interests.").

### 2. The search was unreasonable.

**¶25** Unlike the situation in *King*, the police here did not extract Mitcham's DNA profile pursuant to statutory authority governing routine booking procedures intended to identify perpetrators. *See* 569 U.S. at 443; *see also In re Leopoldo L.*, 209 Ariz. 249, 252 ¶ 14 (App. 2004) (explaining that "compelled DNA testing of juveniles adjudicated delinquent for committing sexual offenses is not an unreasonable search" because statutory procedural safeguards "are more stringent than those required for issuance of a search warrant based on a probable cause finding"). And the police did not obtain a warrant to create Mitcham's DNA profile from the second vial of blood. Under these circumstances, the warrantless search was unreasonable under the Fourth Amendment absent an exception. *See Katz*, 389 U.S. at 357.

**¶26** One such exception occurred here if Mitcham freely and voluntarily consented to the search. *See State v. Valenzuela*, 239 Ariz. 299, 301 ¶ 1 (2016); *see also Jimeno*, 500 U.S. at 250–51 ("[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so."). The State

bears the burden of proving by a preponderance of the evidence that Mitcham voluntarily consented to the search and that the search fell within the scope of that consent. *See Valenzuela*, 239 Ariz. at 302–03 ¶ 11; *State v. Ontiveros-Loya*, 237 Ariz. 472, 479 ¶ 24 (App. 2015); Ariz. R. Crim. P. 16.2(b); *see also Walter v. United States*, 447 U.S. 649, 656 (1980) ("When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization.").

**¶27** The State argues that Mitcham consented to the 2018 warrantless search by consenting to the 2015 DUI blood draw, giving the State lawful possession of the sample and the freedom to later use it to create a DNA profile. Mitcham acknowledges he consented to the blood draw in 2015 to allow the State to determine his alcohol concentration or drug content. But he argues the State exceeded the scope of that consent by later creating the DNA profile to determine his culpability for Feldman's murder, making the warrantless search unreasonable under the Fourth Amendment.

**¶28** Courts measure the scope of a consent to search using an objective standard: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. The question before us then is whether a reasonable person would have understood that consenting to a blood draw to determine alcohol concentration or drug content would include consent to create a DNA profile from that sample. *See id.* We do not think so.

**¶29** Here, the search authorization terms were simple and unambiguous. Mitcham consented to the blood draw after an officer advised him that Arizona's implied consent law required him to submit to the blood draw "for the purpose of determining alcohol concentration or drug content."[1] *See* A.R.S. § 28-1321(A). The officer did not tell Mitcham that his blood could be used to create a DNA profile, and Mitcham did not consent to the search of his blood for that purpose. Further, it was not

---

[1] The year after Mitcham's blood draw, we held that "showing only that consent was given in response to this admonition fails to prove that an arrestee's consent was freely and voluntarily given." *Valenzuela*, 239 Ariz. at 301 ¶ 2. Mitcham does not challenge the voluntariness of his consent to draw his blood for purposes of determining his alcohol concentration or drug content.

necessary to create a DNA profile to determine alcohol concentration or drug content. And Mitcham agreed that his second vial of blood would be destroyed in ninety days if he did not first retrieve it, further supporting a reasonable belief that Mitcham's consent was limited to searching for evidence pertinent only to the pending DUI charge, not other, future crimes.

¶30 A typical reasonable person in Mitcham's circumstances would not have understood that consenting to the blood draw for the limited purpose of determining alcohol concentration or drug content also included consenting to the creation of a DNA profile, especially years later. *See Jimeno*, 500 U.S. at 251. The search of the blood to create the DNA profile therefore exceeded the scope of Mitcham's consent and cannot serve as an exception to the warrant requirement. *See State v. Billups*, 118 Ariz. 124, 126 (1978) (finding that police exceeded the scope of the defendant's consent to search his house by searching an unattached shed); *United States v. Dichiarinte*, 445 F.2d 126, 128, 130 (7th Cir. 1971) (finding that federal narcotics agents exceeded the scope of the defendant's consent to search his home for narcotics by searching for documents); *see also People v. Schmoll*, 48 N.E.2d 933, 934 (Ill. 1943) ("An arresting officer has no more right to make a search beyond the limit prescribed in a consent to search, than he has to exceed the limit prescribed in a search warrant."). Other courts have reached similar conclusions in analogous situations. *See People v. Pickard*, 222 Cal. Rptr. 3d 686, 687, 689 (Cal. App. Dep't Super. Ct. 2017) (recognizing that when a driver consents to a blood test under a state's implied consent law, further testing of the sample for other substances or DNA may be beyond the scope of the consent); *State v. Binner*, 886 P.2d 1056, 1059 (Or. Ct. App. 1994) (concluding that the defendant who consented to a blood draw for purposes of determining alcohol concentration did not consent to having his blood tested for drugs); *State v. Gerace*, 437 S.E.2d 862, 863 (Ga. Ct. App. 1993) (concluding that consent given to test blood for alcohol concentration did not include consent to extract a DNA profile).

¶31 In sum, the 2018 creation of Mitcham's DNA profile from the second vial of blood taken during the 2015 DUI arrest was a search. That search was unreasonable and violated the Fourth Amendment because it was not authorized by a warrant, and the search exceeded the scope of Mitcham's consent to analyze his blood to determine alcohol concentration or drug content. In reaching this conclusion, we emphatically reject the State's position that it was free to analyze Mitcham's blood in any way it pleased simply because the State lawfully possessed the blood vials. *See*

*Walter*, 447 U.S. at 654 ("The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents."); *Gerace*, 437 S.E.2d at 863 ("The State's argument that because the blood sample was obtained with consent it is free to use it for any purpose, paints the notion of consent with far too broad a brush."). Although Mitcham lost his possessory rights to the second vial of blood, he did not lose all of his privacy rights in that blood. *See Mario W.*, 230 Ariz. at 128 ¶ 27, 129 ¶ 31; *see also State v. Granville*, 423 S.W.3d 399, 426 (Tex. Crim. App. 2014) (Keller, P.J., concurring) (recognizing that people can have expectations of privacy in the informational dimension of property separate and apart from the expectation of privacy in the physical dimension of that property). The police violated Mitcham's Fourth Amendment rights by conducting a search beyond the scope of his consent.

**B.   The Exclusionary Rule Does Not Require Suppression Of Mitcham's DNA Profile.**

   1.   <u>There are exceptions to the exclusionary rule.</u>

**¶32**         The Fourth Amendment itself does not require courts to suppress evidence gathered in violation of that amendment. *See Davis v. United States*, 564 U.S. 229, 236–38 (2011). Instead, courts invoke the judicially created "exclusionary rule" to suppress evidence obtained in violation of the Fourth Amendment. *See Utah v. Strieff*, 579 U.S. 232, 237 (2016); *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *Valenzuela*, 239 Ariz. at 308–09 ¶ 31. The exclusionary rule is a prudential doctrine created to "compel respect for the constitutional guaranty" by deterring future violations. *See Davis*, 564 U.S. at 236 (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)); *Valenzuela*, 239 Ariz. at 308–09 ¶ 31. The rule applies to evidence obtained directly from an illegal search and to evidence later discovered because of the illegal search, which is commonly called the "fruit of the poisonous tree." *Strieff*, 579 U.S. at 237 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). The rationale for the exclusionary rule is that the prosecution should not be placed in a better position because of the illegal conduct. *Nix v. Williams*, 467 U.S. 431, 443 (1984).

**¶33**         Importantly, "[s]uppression of evidence . . . has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006); *State v. Weakland*, 246 Ariz. 67, 73 ¶ 20 (2019). We only apply the exclusionary rule "where its deterrence benefits outweigh its 'substantial social costs.'" *Hudson*, 547 U.S. at 591 (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)); *Nix*, 467 U.S. at 443 (accepting that

the way to ensure Fourth Amendment protections "is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes"). Consequently, we have recognized several exceptions to the exclusionary rule, including the "independent source" and "inevitable discovery" exceptions. *See Strieff*, 579 U.S. at 238.

**¶34**       The "independent source" exception permits the admission of evidence discovered during or because of an unlawful search if the evidence was also obtained independently from activities that were tainted by the illegality. *See Murray v. United States*, 487 U.S. 533, 537–38 (1988); *State v. Bolt*, 142 Ariz. 260, 263 (1984). For instance, in *Segura*, the Supreme Court held that although the police illegally entered private premises, the exclusionary rule did not apply because police seized property at those premises pursuant to a search warrant that was based on information unconnected to the illegal entry. 468 U.S. at 814. The independent source exception, which applies to violations of the Fourth, Fifth, and Sixth Amendments, rests on the premise that "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied" without the illegal conduct. *See Murray*, 487 U.S. at 537, 542.

**¶35**       The "inevitable discovery" exception applies "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," making the reason for applying the exclusionary rule meaningless. *Nix*, 467 U.S. at 444. Courts extrapolated this exception from the independent source exception, reasoning that because "tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered" from such a source. *Murray*, 487 U.S. at 539. Importantly, "[t]he exception does not turn on whether the evidence would have been discovered had [officers] acted lawfully in the first place," but instead "applies if the evidence would have been lawfully discovered *despite* the unlawful behavior and independent of it." *Brown v. McClennen*, 239 Ariz. 521, 524–25 ¶ 14 (2016) (emphasis added). For example, in *State v. Jones*, 185 Ariz. 471, 481 (1996), we held that despite an improper warrantless search of the arrested defendant's belongings while stowed in a police car, because police inevitably would have conducted a proper inventory search of those belongings upon return to the station, the exclusionary rule did not apply to suppress evidence of the defendant's bloody clothing.

13

¶36        In sum, the distinction between the independent source exception and the inevitable discovery exception rests on whether the evidence *was* discovered through an independent, untainted source (independent source exception), or whether the evidence *would have been* discovered through an independent, untainted source despite the illegal search (inevitable discovery exception).   *See State v. Boll*, 651 N.W.2d 710, 716–17 ¶¶ 20–26 (S.D. 2002) (similarly distinguishing these exceptions).

2.   The inevitable discovery exception applies here.

¶37        Turning to this case, we agree with the State that the police would have inevitably obtained Mitcham's DNA profile from an independent, untainted source despite the warrantless search of the second vial of blood taken after the 2015 DUI arrest.   To prove the inevitable discovery exception, the State cannot speculate but must instead "focus[] on demonstrated historical facts capable of ready verification or impeachment."   *Nix*, 467 U.S. at 444 n.5.   The court "view[s] affairs as they existed at the instant before the unlawful search" and then determines "what would have happened had the unlawful search never occurred."   *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995) (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)).

¶38        Here, the verifiable facts demonstrate inevitable discovery of Mitcham's DNA profile.   At the time of the illegal search in 2018, Mitcham was facing charges unrelated to Feldman's murder.   In 2016, the state charged him with committing a narcotic drug violation, a class four felony. The next year, the state charged him with two counts of aggravated DUI, class six felonies.   In June 2022, about six months before the suppression hearing in this case, Mitcham pled guilty to all charges in the narcotics/DUI cases, and the court sentenced him to a term of imprisonment in the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR").

¶39        Arizona law requires ADCRR to take a sample of blood or other bodily substance for purposes of DNA profiling from every person convicted of a felony and sentenced to prison.   *See* A.R.S. § 13-610(A), (O).[2]

_____

[2]   Section 13-610(A) refers to the "state department of corrections."   That agency has changed its name to the "Arizona Department of Corrections, Rehabilitation   and   Reentry."         *See   ADCRR   Home   Page,*

Thereafter, ADCRR is required to transmit the sample to DPS, which must extract a DNA profile and enter the results into Arizona's DNA identification system and CODIS. *See Mario W.*, 230 Ariz. at 124 ¶ 5; § 13-610(H); § 41-2418(A). The profile can then be used for "law enforcement identification purposes" and in any criminal prosecution. *See* § 13-610(I)(1)–(2). ADCRR must extract the sample for DNA profiling within thirty days of sentencing but is prohibited from doing so if DPS "has previously received and is maintaining a sample sufficient for [DNA] testing." *See* § 13-610(A), (G).

**¶40** Pursuant to § 13-610, the State would have inevitably discovered Mitcham's DNA profile despite the illegal search of the second vial of blood taken in 2015. The narcotics/DUI convictions and resulting sentences were unrelated to and thus untainted by the illegal searches. Had those searches not occurred, § 13-610(A) would have required ADCRR to collect samples of Mitcham's blood or bodily substances, and DPS would have obtained the same DNA profile that was extracted from the second vial of blood. As Mitcham acknowledged at oral argument, the only reason this did not occur was because DPS already had Mitcham's genetic sample and DNA profile from the searches conducted in 2018,[3] and was therefore prohibited from taking new samples. *See* § 13-610(G). Suppressing the DNA evidence in these circumstances would not fulfill the exclusionary rule's purpose of preventing the prosecution from being in a better position due to the illegal search. *See Nix*, 467 U.S. at 443. Instead, suppression would put the prosecution in a worse position than it would have been in without the illegal search. *See Murray*, 487 U.S. at 537, 542.

**¶41** We are not persuaded by Mitcham's arguments against application of the inevitable discovery exception. First, he argues that the

_____

https://corrections.az.gov (last visited Dec. 9, 2024). We therefore refer to the agency using its current name.

[3] We could not determine from the record whether the Scottsdale Police transferred Mitcham's blood sample to DPS and uploaded the DNA profile into Arizona's DNA identification system. But the police were required to transmit a sample of buccal cells or other bodily substances for DNA testing to DPS when Mitcham was arrested for Feldman's murder in 2018. *See* § 13-610(K) (requiring transmittal of a sample for persons arrested for listed offenses, including first degree murder). Mitcham acknowledges that in 2018 DPS had a sample of his genetic material and his DNA profile.

DNA profile would not have been inevitably discovered from his 2022 felony convictions because DPS never received a blood or bodily substance sample from which to create a DNA profile. *See* § 13-610(A). This argument places form over substance, and we reject it. As explained, § 13-610(G) prohibited ADCRR from extracting a new sample because DPS already had a sample and a DNA profile. The point here is that had the illegal search not occurred, ADCRR would have provided a sample to DPS, which would have extracted Mitcham's DNA profile. And no purpose would be served by suppressing Mitcham's DNA profile only to have ADCRR provide DPS with a new sample so the same profile could again be extracted.

**¶42**        Second, Mitcham asserts that the inevitable discovery exception applies only when "regular police work already in progress" at the time of the illegal search demonstrates that the evidence would have been inevitably discovered. Mitcham contends that because "the possible 'future' acquisition of [his] DNA from his 2022 convictions is not evidence that 'inevitably' emerged during the homicide investigation," and the police "had no way of knowing that [he] would plead guilty over four years later" to the narcotics/DUI charges, the police investigating at the time of the illegal searches would not have inevitably discovered his DNA profile. Applying the inevitable discovery exception in these circumstances, he argues, would "rel[y] solely on speculation, and such speculation alone cannot sustain the State's burden" under *Nix*. We disagree.

**¶43**        Relying exclusively on investigative facts and procedures available to police at the time of the illegal search to assess inevitable discovery is unnecessarily restrictive. *Nix* did not confine the examination of "historical facts capable of ready verification or impeachment" to facts existing before an illegal search. *See Nix*, 467 U.S. at 444 n.5. Notably, "Arizona has adopted the broad view of the inevitable discovery rule," and so "the State is not required to demonstrate that police initiated lawful means to acquire evidence prior to its seizure." *State v. Davolt*, 207 Ariz. 191, 204 ¶ 37 (2004). Similarly, we see no reason to require the State to prove the exception by projecting investigative outcomes using only facts available to the police before the illegal search. The key inquiry is whether verifiable facts exist from which the court can find, at the time of the suppression hearing, that the evidence would have been lawfully discovered despite the illegal search and independent of it. *See Brown*, 239 Ariz. at 525 ¶ 14.

16

**¶44**        We find the Seventh Circuit's decision in *Sutton v. Pfister*, 834 F.3d 816 (7th Cir. 2016), persuasive.   There, the State of Illinois unlawfully collected a sample of defendant Sutton's blood during his prosecution for a 1991 attempted sexual assault and extracted his DNA profile.   *Id.* at 818. The state did not introduce DNA evidence at trial, but Sutton was nevertheless convicted and sentenced to prison.   *See id.*   Meanwhile, law enforcement matched Sutton's illegally obtained DNA profile to physical evidence collected from a 1990 sexual assault.   *See id.*   The Seventh Circuit held that the inevitable discovery exception permitted the trial court to admit the DNA evidence in Sutton's 1990 sexual assault trial.   *See id.* at 822. It found that the state would have lawfully obtained Sutton's blood sample upon his conviction for the 1991 attempted sexual assault pursuant to an Illinois law that required blood and saliva samples from convicted sex offenders.   *See id.*   Conspicuously, the decision did not turn on whether police in the 1991 case had any way of knowing at the time of the illegal search that Sutton would be convicted without the DNA evidence and then lawfully required to submit blood and saliva samples.

**¶45**        The cases cited by Mitcham do not persuade us to view the inevitable discovery exception more restrictively.   In *State v. Lamb*, 116 Ariz. 134, 138 (1977), this Court agreed with other courts that "evidence obtained as a result of an unlawful search need not be suppressed where, in the normal course of the police investigation and absent the illicit conduct, the evidence would have been discovered anyway."   Although the events demonstrating inevitable discovery there had occurred at the time of the illegal search, nothing in *Lamb* precluded application of the inevitable discovery exception if new events had occurred after the illegal search.   The key consideration was whether the means of discovery was untainted by the illegal search.   *See id.*

**¶46**        The cases Mitcham cites from other jurisdictions admittedly use language suggesting that the inevitable discovery exception applies only when investigative facts existing before an illegal search demonstrate inevitable discovery.   *See United States v. Lang*, 149 F.3d 1044, 1047 (9th Cir. 1998) (stating that application of the exception requires a court "to determine whether a reasonable probability of discovery existed prior to the unlawful conduct, based on the information possessed and investigations being pursued at such time" (quoting *United States v. Drosten*, 819 F.2d 1067, 1070 (11th Cir. 1987))); *Eng*, 971 F.2d at 861 ("[T]he alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized." (alteration in original)

(quoting *United States v. Cherry*, 759 F.2d 1196, 1205 n.10 (5th Cir. 1985))). Neither case, however, dealt with identification evidence like the DNA evidence here, which can be extracted from different sources and at different times. Rather, they concerned physical evidence that was the subject of the illegal search. *See Lang*, 149 F.3d at 1046 (concerning "crack cocaine found in a cereal box hidden inside the engine compartment" of a vehicle); *Eng*, 971 F.2d at 857 (regarding the contents of defendant's safe). Thus, it is unsurprising that these courts required the government to show that an active investigation, independent from and untainted by the illegal search, would have uncovered the evidence. Regardless, to the extent these cases categorically preclude assessment of events occurring after the illegal search to decide whether to apply the inevitable discovery exception, we disagree for the reasons previously explained. *See* Part B(2), ¶¶ 38–40, 43–44.

¶47　　　In sum, the inevitable discovery exception applies here, and the trial court therefore erred by suppressing Mitcham's DNA profile. If the police had not created a DNA profile from the second vial of blood in 2018, DPS would have done so after his 2022 felony convictions. This is certain, not speculative, so it easily satisfies the preponderance standard adopted in *Nix*. *See Nix*, 467 U.S. at 444 n.5. In light of this conclusion, we do not address whether other exceptions to the exclusionary rule apply here. And we do not address Mitcham's arguments based on the Arizona Constitution's Private Affairs Clause, as they were neither raised at the trial court nor sufficiently developed here. *See* Ariz. Const. art. 2, § 8.

## CONCLUSION

¶48　　　For the foregoing reasons, although we agree with the court of appeals' holding, we vacate its opinion to replace its reasoning with our own. We also reverse the trial court's suppression order and remand for further proceedings.